UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6221 Civ. Dimitrouleas/Johnson

UNITED STATES OF AMERICA,

PLAINTIFF,

v.

OLD DOMINICAN TOBACCOS, INC., a Florida corporation; and NEIL YOUNG, individually, and as an officer of the corporation,

DEFENDANTS.

**MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AND RESPONSE TO ORDER TO SHOW CAUSE**

Default was entered in this case on May 19, 2000. On September 6, this Court issued an order to show cause why this case should not be dismissed. Since May, the United States has attempted to resolve this matter through contact with a former attorney of defendants. However, these efforts have been unsuccessful. For the reasons stated below, the Court should enter default judgment for a permanent injunction and civil penalties in favor of the United States.

CIVIL PENALTIES

The United States is allowed civil penalties of $11,000.00 per violation of the Franchise Rule. 15 U.S.C. § 45(m)(1)(A).[1] Additionally, restitution and consumer redress are authorized. 15 U.S.C. §§ 57b(b). Because defendants did not respond to the complaint nor enter an

[1] Section 45(m)(1)(A) provides for a $10,000 penalty amount, but that has been adjusted for inflation to $11,000 under the Debt Collection Improvement Act of 1996. See 16 C.F.R. 1.98(d).

13

appearance even though properly served, the United States was unable to obtain discovery from defendants. Thus, the United States was unable to determine the exact number of violations of the Franchise Rule the defendants committed.

Nevertheless, the United States has obtained some documentation of the number of violations. In defendants' statement to an undercover FTC investigator posing as a consumer, they stated that they had "499 distributors." See Attachment A at 13. This transcript and its attachment reveal that defendants also violated the Franchise Rule with respect to the FTC undercover investigator. Although no sale to the investigator occurred, an offer of sale was made, and an offer to "any prospective franchisee" without required disclosures is a violation of the Franchise Rule. 16 C.F.R. § 436.1 & 436.1(a). Additional information regarding the number of defendants' franchisees was provided to plaintiff by the former attorney of defendants, which included purchase orders for 30 franchisees. There is no evidence that defendants provided the disclosures required by the Franchise Rule to any of their franchisees.

Given the inability of the United States to undertake discovery, a judgment for civil penalties could be entered against defendants for each of these 30 violations of the Franchise Rule, to say nothing of defendants' own "499" figure. However, information obtained by the United States indicates that defendants lack the ability to pay a penalty of much more than $11,000.00. "Ability to pay" is a factor to be considered in awarding a civil penalty. See 15 U.S.C. § 45(m)(1)(C); U.S. v. Reader's Digest Ass'n, Inc., 494 F. Supp. 770, 779 (D.Del. 1980), aff'd, 662 F.2d 955 (3d Cir. 1991), cert denied, 455 U.S. 908 (1982). Thus, the United States recommends a civil penalty of $11,000.00 be imposed on defendants. Space is provided for entry of a civil penalty in Section XII on page 16 in the attached proposed Judgment and Order.

PERMANENT INJUNCTION

Although the defendants may no longer be engaged in the business of selling cigar distributor franchises, it appears that defendant Neil Young has, through various corporations, engaged in similar law violations in the past and may do so in the future. Thus, to protect consumers from future violations, a detailed permanent injunction is necessary and appropriate. The attached proposed Order is a standard Order used in this type of case.[2] The United States respectfully requests entry of this Judgment and Order of Permanent Injunction.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

DAVID W. OGDEN
Assistant Attorney General
Civil Division
U.S. Department of Justice

GUY A. LEWIS
United States Attorney

By: [signature]
BARBARA L. PETRAS
Assistant United States Attorney
500 E. Broward Blvd., 7th Floor
Fort Lauderdale, FL 33394
Florida Bar # 209181
PHONE: (954) 356-7314
FAX: (954) 356-7180

Of Counsel:

EILEEN HARRINGTON
Associate Director for
Marketing Practices
Federal Trade Commission
Washington, D.C. 20580

CRAIG TREGILLUS
Attorney
Federal Trade Commission
Washington, D.C. 20580
PHONE: (202) 326-2970
FAX: (202) 326-3395

[2] See Attachment B.

DRAKE CUTINI
Trial Attorney
*Office of Consumer Litigation*
P.O. Box 386
Washington, D.C. 20044
PHONE: (202) 307-0044
FAX: (202) 514-8742

September 21, 2000

CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was served upon the defendants by mail as follows on September 21, 2000:

Old Dominican Tobacco Corporation
4801 S. University Drive, Suite 3090W
Davie, Florida 33328

Neil Young,
4216 North Ocean Drive
Hollywood, Florida 33019

Peter Gruber, Esq.
One Datran Center
Suite 910,
9100 South Dadeland Boulevard
Miami, Florida 33156

Barbara L. Petras
Assistant united States Attorney

DECLARATION OF MARTHA W. VERA
PURSUANT TO 28 U.S.C. § 1746

1. I am an investigator with the Federal Trade Commission ("FTC"). My office address is 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. I have personal knowledge of the matters discussed in this declaration, and if called as a witness, I could and would competently testify as to the matters stated herein.

2. As part of my work as an FTC investigator, I tape record conversations with targets of FTC investigations. I have experience and training in FTC policy and procedures with regard to tape recording, the proper use of the recording equipment, and preservation of evidence following the recording.

3. Beginning on or about October 26, 1999, I placed a call to a company called Old Dominican Tobacco Co. at telephone number 1-800-334-0946, using the toll free number obtained from an advertisement in the *Commercial Appeal*. Attachment A is a true and correct copy of the advertisement I used. I posed as "Kathy Monroe," a consumer interested in purchasing a business opportunity. I had a series of telephone conversations with telemarketers and references from Old Dominican Tobacco Co. I tape recorded these conversations. Immediately after I made the recordings, I played back each tape to confirm that the conversations had been recorded properly.

GOVERNMENT
EXHIBIT
A

4 After reviewing each tape, I removed the plastic tabs at the rear edge of the tape cassette to prevent erasure or further recording As tape custodian, I duplicated each tape and then placed the original tape in a locked cabinet over which I have custody and control.

5. For The Record, Inc., a private reporting company, transcribed the duplicate tapes. After I received a transcript of each tape, I reviewed the transcript for accuracy by comparing it with the original recording I corrected any errors on the transcript and wrote my initials, "MV," next to the corrections. I redacted from the transcript the address and telephone number that I used, in order to protect these investigational resources Attachment B consists of true and correct copies of three transcripts of the conversations that I recorded

6 Dan Reed sent me some written promotional material Attachment C is a true and correct copy of the Old Dominican Tobacco Co written promotional material sent to me.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on January 10, 2000

Martha W. Vera

v-06221-WPD Document 13 Entered on FLSD Docket 09/22/2000 Pa

Business Opportunities

BEST HOME BASED
No Inventory, Clients Provided
Domestic/Import/Export
Merchandise Bkr. Invest $
FREE INFO PACKAGE
(888) 333-346[illegible] 24 Hours
www.unitedtraders.com
UTA 2950 E. Flamingo Rd. Ste B
Las Vegas, NV 89121

Business Opportunities

BUY FORECLOSURES! Use our $$! Split profits! Training! Info 800-331-4555 X7320. Nationwide R.E., 14360 S. Tamiami Trl., Ft. Myers, FL 33912.

Business Opportunities

**Bonus Building Care**
CLEANING FRANCHISE
Build Your Future.
$1000.00 down. Accounts, training & support incl.
Lowest mo. fees. Free info.
Call (901)380-0100

Business Opportunities

**CIGAR DISTRIBUTORSHIP**
Brand names. Be your own boss. $100K pot. Small start-up. 1-800-334-0946. Old Dominican Tobacco, 4801 S. University Dr. #3090, Davie, FL 33328.

ATTACHMENT A

# OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO. P984405

TITLE VENDING SWEEP

DATE RECORDED: NOVEMBER 1 & 2, 1999

TRANSCRIBED: NOVEMBER 3, 1999

PAGES 1 THROUGH 52

TELEPHONE CONTACT WITH JOHN MARTIN & DAN REED OF OLD DOMINICAN CIGARS

---

FOR THE RECORD, INC.

Attachment B (2 of 3)

FEDERAL TRADE COMMISSION

I N D E X

| TELEPHONE CONTACT: | PAGE: |
|---|---|
| With John Martin (attempted) | 3 |
| With John Martin (actual) | 4 |
| With Dan Reed | 47 |

FEDERAL TRADE COMMISSION

In the Matter of: )
Vending Sweep ) Matter No. P984405
)
------------------------------)

Monday, November 1, 1999
Tuesday, November 2, 1999

The following transcript was produced from a live tape provided to For The Record, Inc. on November 3, 1999.

APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:

**MARTHA VERA, INVESTIGATION**
Federal Trade Commission
6th Street and Pennsylvania Avenue, N.W.
Washington, D.C.
(202)326-3096

P R O C E E D I N G S

- - - - -

MS. VERA: Hello, this is Martha Vera at the Federal Trade Commission. Today is Monday, November 1st, 1999. The time is approximately 10:55. I will be calling the Old Dominion (sic) Tobacco Company at 800-334-0946 and recording this call. I will be using the name Kathy Monroe. This concludes this test.

---

**ATTEMPTED TELEPHONE CONTACT WITH JOHN MARTIN**

UNIDENTIFIED FEMALE: Old Dominican Tobacco.

KATHY MONROE: Hi, is John Martin there?

UNIDENTIFIED FEMALE: No, he's not in yet. Could I take a message?

KATHY MONROE: Uh, yes, this is Kathy Monroe --

UNIDENTIFIED FEMALE: Okay.

KATHY MONROE: -- and I'm returning his call.

UNIDENTIFIED FEMALE: Okay.

KATHY MONROE: Will you tell him -- can I -- will you tell him I did get the package --

UNIDENTIFIED FEMALE: Uh-huh.

KATHY MONROE: -- that he sent?

UNIDENTIFIED FEMALE: Okay. All right. M O N R O E -- okay, I'll tell him you called.

KATHY MONROE: Thank you.

UNIDENTIFIED FEMALE: Okay. Bye.

KATHY MONROE: Bye.

**(The first call was concluded.)**

---

MS. VERA: Hello, this is Martha Vera at the Federal Trade Commission. Today is Tuesday, November 2nd, 1999, the time is approximately 4:40. I will call 1-800-334-0946, Old Dominion (sic) Tobacco Company, and record this call. I am returning a call to John Martin, who left a message on my answering machine on November 2nd. This concludes this test.

---

**TELEPHONE CONTACT WITH JOHN MARTIN**

JOHN MARTIN: Old Dominican.

KATHY MONROE: Hi, may I speak to John Martin?

JOHN MARTIN: Speaking.

KATHY MONROE: Mr. Martin, it's Kathy Monroe.

JOHN MARTIN: Yes, how are you?

KATHY MONROE: Good, how are you?

JOHN MARTIN: Very good, very good. I had left a message for you earlier, Kathy, concerning the package.

KATHY MONROE: I did get it.

JOHN MARTIN: Okay.

KATHY MONROE: Okay.

JOHN MARTIN: Good. Did you get a chance to go over it?

KATHY MONROE: I did. It looks good.

JOHN MARTIN: Well, we have an interesting situation because I was talking to the Board of Directors --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and they are trying to find one last distributor for your area, and they are offering exclusivity there. Did you have any questions after you read that or --

KATHY MONROE: Uh -- yeah, but why don't you tell me what you're going to tell me first.

JOHN MARTIN: Okay. It says -- let me just switch over to my desk and pull your file out, okay?

KATHY MONROE: Okay.

JOHN MARTIN: Hang on.

**(Pause while on hold.)**

JOHN MARTIN: Kathy?

KATHY MONROE: Yeah.

JOHN MARTIN: Okay. You're looking for the Rockville area, right?

KATHY MONROE: Right.

JOHN MARTIN: Okay. We can give you an exclusivity there. Now, when you initially talked to Dan, do you know what level he was talking to you about in terms of how many locations?

KATHY MONROE: I think it was somewhere -- it was either the first one -- the first level or the second --

JOHN MARTIN: Or the second --

KATHY MONROE: -- and --

JOHN MARTIN: Okay. Because the first one would be the basic starter program, which is approximately $7,500 start up and the 24 locations is about a $16,000 start up.

The difference, of course, is that the first one is about six hours of work a week. The 24-lo... program is basically a program which is the most popular one we have simply because it automatically puts you in the potential of $100,000 or more income per year.

The reason is real simple. If you look at the revenue projections, if you have 24 locations --

KATHY MONROE: Um-hmm.

JOHN MARTIN: And let's say all you sold was just five cigars a day at each one --

KATHY MONROE: Um-hmm.

JOHN MARTIN: At a minimum $3 profit, your annual projection is about $130,000 net. It takes about a Saturday and a Sunday afternoon to service 24 accounts, so --

KATHY MONROE: That's amazing, isn't it?

JOHN MARTIN: Well, it's a numbers game, you know, because if I told you, for example, you're going to sell five cigars -- let's say -- a typical location would be, let's say, the Piano Bar at the Hilton Hotel, okay?

KATHY MONROE: Okay.

JOHN MARTIN: If I told you, oh, you know, on a busy night there you're going to sell five cigars and make $15. That doesn't sound like much. You made a $15 profit at the Hilton, you know. But, if you go do that over 30 days, it's $450 BUCKS MV that's what each location is generating. If you'~~r~~ve MV got 24 locations around town -- restaurants, bars, night clubs, golf courses, country clubs -- all the upscale places -- if you've got 24 locations generating $450 each every month, you're generating $10,800 a month, which is an annual income of $129,600 a year.

I mean, even if that was completely wrong and all you sold was just two cigars a day at each location, using that same formula it's still $52,000 a year.

KATHY MONROE: Have any of your distributors -- I mean -- what are they -- is two sales a minimum?

JOHN MARTIN: Uh -- no, no, no, no. Two sales is just an example --

KATHY MONROE: Okay.

JOHN MARTIN: -- of even if you did terribly and you sold just two cigars, you're -- you know -- you're doing very well. The national average is somewhere between seven and 12 sales a day at A decent locations.

KATHY MONROE: Okay --

JOHN MARTIN: Anything --

KATHY MONROE: -- is that what your distributors that you have now --

JOHN MARTIN: Right. The best of the -- approximately the national average across the board.

Now, I'm got a guy that called me up and said that on a Friday night he sold 125 cigars on a Friday night. Now, in other words, he emptied out a humidor.

Now, I asked where the location was -- believe it or not -- it's at a strip bar. And it's one of those strip bars where the men take off their clothes for the

women, you know (laughter).

KATHY MONROE: Oh, okay.

JOHN MARTIN: So, I mean, he said the bartender called the next day and said that you got to come in and refill this because it's Saturday and I've got no more cigars left.

That's -- that's an extreme example. We have golf courses that do 200/300 cigars sometimes on Friday, Saturday and Sunday afternoon.

We've got restaurants that do 30 to 40 cigars during lunch and dinner hour.

BECAUSE MV ~~We've got~~ some of these PLACES MV that are aggressively marketed. In other words, the waitress will put the humidor in a fancy cart and push it right up to the dinner table, you know.

We have, you know, gift shops that'll do 80/90 cigars every -- every couple of weeks.

So, but when you average it out, you know, a decent location that's giving you seven to 12 sales a day, that makes you a lot of money in this business.

KATHY MONROE: Yeah --

JOHN MARTIN: Because you work on the $3 profit, which is 50 to 60 percent profit, you know.

KATHY MONROE: Right.

JOHN MARTIN: And here's the bottom line:

Let's say eventually you ended up with 100 locations in the Rockville area, which isn't a lot of locations. You know, basically it's about four days of work a week --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and you might have 20 restaurants, 20 hotels, 20 sports bars -- that kind of thing, you know?

KATHY MONROE: Um-hmm.

JOHN MARTIN: But if you have 100 locations eventually and you're basically selling just one cigar a day at each one -- worse case scenario -- you're still making $300 a day, you know, profit.

KATHY MONROE: Wow.

JOHN MARTIN: But what if you sold 10 cigars a day? You see what I'm saying?

KATHY MONROE: Right.

JOHN MARTIN: Then you're making $3,000 a day. So, the key here is obviously the location.

KATHY MONROE: Right.

JOHN MARTIN: And, so, how we overcome that problem is once you become a distributor, we fly out our locator out there. Have you talked to the locator at all?

KATHY MONROE: No.

JOHN MARTIN: Well, once you become a

distributor, the locator will come out there, we make sure you have a separate contract with them that gives you a performance warranty. In other words, they'll go out and get all the accounts for you. You have to be 100 percent satisfied with the accounts you're getting. If not, you simply decline it.

But they come out there, they pick you up in their car, they take you ~~out to~~ ON A TOUR OF MY the locations. If you like what you see, you go inside, they introduce you to the owner or the manager. The owner or the manager signs a retail agreement with you, they show you where to place the equipment and you're in business.

KATHY MONROE: Now, is that done before they get here?

JOHN MARTIN: Most of it's done before you get here because a lot of it is prequalified.

KATHY MONROE: Okay.

JOHN MARTIN: A lot of the -- they have a hugh database, they prequalify, they do a lot of telemarketing, they talk to these people ahead of time and many of the -- so, in other words, when the actual locator gets out there and he's doing 24 locations, this guy's staying in a hotel paying $100 bucks a night, he doesn't want to be there a week, you know.

KATHY MONROE: Right.

JOHN MARTIN: He's going to knock it out in two days for you. So, essentially, most of the work is prequalified, but when they line up all the locations for you, then they come out there, they take you to each one. If you like what you see, you go inside, they sign a contract with you, you know, you basically set up the equipment, you're in business.

Now, they will also give you a written performance warranty, which guarantees you in writing that if you're not getting the sales that's required at each location -- like I said, I consider anything less than five to be failure -- but if for any reason you're not happy with the location, he's going to come back and relocate you at no cost.

KATHY MONROE: Okay. So, once I sign an agreement with you, you'll send a locator?

JOHN MARTIN: Correct.

KATHY MONROE: Okay.

JOHN MARTIN: Right.

KATHY MONROE: Uh --

JOHN MARTIN: And, uh --

KATHY MONROE: -- has anybody -- and, you, I think I know how long -- how long have you been in business? I forgot. Has anybody gone out of business this year, like not made it?

JOHN MARTIN: We have 499 distributors, as of this morning --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- in fact, if you signed up you're be our 500th distributor. So --

KATHY MONROE: Oh, cool.

JOHN MARTIN: -- that's a cool number, there --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- but basically we've done this program with distributors for two years --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and with the exception of one individual who has health problems, every other distributor has expanded in the last 24 months.

KATHY MONROE: Wow.

JOHN MARTIN: Only because it's a real simple business. There's no selling involved on your part and, essentially, you're talking about upscale businesses that have their own track record, they have their own clientele base, they are established, you know.

A typical location, for example, would be a golf course or a country club where the membership is $30,000 a year just for people to join, you know.

Now, a place like that, these guys, these businessmen and businesswoman when they go out their

golfing or whatever on a -- on a daily basis, these guys don't think twice about spending $6 on a stogie --

KATHY MONROE: Where --

JOHN MARTIN: -- you know, I mean --

KATHY MONROE: Yeah.

JOHN MARTIN: -- they're out there four or five hours on the golf course --

KATHY MONROE: That's true.

JOHN MARTIN: -- you've got five-star restaurants, I mean, where they're charging $50 bucks for a bottle of wine. A waitress comes by with a good looking humidor with some really nice cigars in there, you know, $7.95 is not much to ask --

KATHY MONROE: No.

JOHN MARTIN: -- a lot of people smoke cigars, you know. We -- you know, restaurants, bars, nightclubs -- sports bars are phenomenal. I mean, some of these places are emptying out a humidor during a game, you know.

And, so, the key is obviously the locations, and -- but we've done the distributorship program for two years, all of our distributors have expanded with the exception of one, who's got health reasons, but that level of expansion has been different because a lot of our distributors -- some of our distributors have four or

five jobs, they're doing it to supplement their income. A few of them have made it a full-time venture.

Our biggest distributor has 350 accounts and they're distributing in Panama City, Florida. He does from Panama City down to Biloxi, Mississippi, and Gulfport --

KATHY MONROE: Wow.

JOHN MARTIN: -- and, so, he's covering that whole, you know, all the hotels and all the seashore and the casinos and all that.

KATHY MONROE: Um-hmm.

JOHN MARTIN: Our distributor in Savannah started off -- a real nice guy, by the way -- he started off with 10 locations about 10 months ago, or a dozen locations, something like that.

KATHY MONROE: Um-hmm.

JOHN MARTIN: He's up to 70 locations now.

KATHY MONROE: Wow.

JOHN MARTIN: And if you'd like to talk to him -- I talked to him earlier this morning and he said that if there's anybody else who would like to know more about it, he would be happy -- he wouldn't mind if I gave out his phone number.

KATHY MONROE: Oh, really?

JOHN MARTIN: Sure.

KATHY MONROE: Oh, okay.

JOHN MARTIN: I have no objection about -- with you talking to one of our distributors. You know, the only thing is I have to get their permission to give out their phone number, because this is a private business, it's all a cash business mostly --

KATHY MONROE: Okay.

JOHN MARTIN: -- and some of these guys don't even want to be bothered with me calling them let alone somebody who's not a distributor yet.

KATHY MONROE: Okay.

JOHN MARTIN: So -- but you can talk to this fellow and he'll be able to tell you his experiences from his point of view.

KATHY MONROE: Okay.

JOHN MARTIN: And he, like I said, he's grown over 70 locations now. His name is Patrick Benton -- B E N T O N --

KATHY MONROE: Okay.

JOHN MARTIN: He's an exclusive distributor for Old Dominican Tobacco for the Savannah, Georgia area -- you ever been down in Savannah?

KATHY MONROE: No.

JOHN MARTIN: Okay. Savannah is like -- I would say about four hours south of Columbia, South

Carolina.

KATHY MONROE: Okay.

JOHN MARTIN: It's -- and, of course, it's a real big tourist area. I mean, all the victorian homes and tremendous amount of tourists, especially after that movie that came out last year they really got busy there.

KATHY MONROE: Um-hmm.

JOHN MARTIN: That Midnight in the Garden of Good and Evil?

KATHY MONROE: Oh, right.

JOHN MARTIN: That was all filmed in there. But he is area code 904 --

KATHY MONROE: 904 --

JOHN MARTIN: -- 343 --

KATHY MONROE: -- 343 --

JOHN MARTIN: -- 9633.

KATHY MONROE: -- 9633.

JOHN MARTIN: Right. Now, he started off, like I said, with a dozen locations, which he used a professional locator for, and all of his future expansion he did on his own.

KATHY MONROE: Okay.

JOHN MARTIN: So, he's up to 70 locations now, and interestingly enough the reason I think you ought to talk to him is because he never ~~smoked~~ SOLD cigars before --

KATHY MONROE: Okay.

JOHN MARTIN: -- and never had a vending route before.

KATHY MONROE: Oh, okay.

JOHN MARTIN: So, it's perfect because that's exactly kind of what you're going to be doing, you know --

KATHY MONROE: Okay.

JOHN MARTIN: -- and this way you can be talking to someone who is actually doing this. Interesting LY MJ enough, he also does a lot of private labels. You know how that works?

KATHY MONROE: No.

JOHN MARTIN: Well, you can -- let's say one of your accounts is a fancy hotel in Rockville --

KATHY MONROE: Okay.

JOHN MARTIN: -- right? A five-star hotel. You can actually put their name and logo on the band of a cigar.

KATHY MONROE: Oh.

JOHN MARTIN: You can ALWAYS MJ create a private custom label for them. We -- it enables you to get orders of a thousand cigars or more at a time, Kathy --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and because you're creating a

custom label. Now, for example, Patrick Benton, when you talk to him --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- he gave me an order a month or two ago for a company called Palmer Johnson of Savannah, who's a major manufacturer of luxury yachts and boats.

KATHY MONROE: Okay.

JOHN MARTIN: And we did 2,000 cigars with their logo on it. I guess they -- this company gives these cigars out at the boat shows.

KATHY MONROE: Okay.

JOHN MARTIN: You know? And, also, he did one for -- he has a sports bar -- I guess he's got like a biker bar --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- in Savannah. So, we created a -- a little band for the cigar with a Harley-Davidson on it.

KATHY MONROE: Oh.

JOHN MARTIN: Yeah, so, I mean, it's a really interesting thing. We've done it for law firms, we've done it for -- IBM, for example, I did 1,000 labels for them last week with the IBM logo on the band.

KATHY MONROE: Okay.

JOHN MARTIN: They're giving these out at

dinners and conventions, you know. It's a great advertising gimmick for them to write off, you know.

KATHY MONROE: Um-hmm.

JOHN MARTIN: But enables you to get a lot of, you know, big orders in terms of a thousand cigars at a time.

So, ask Patrick Benton about that. He told me one time he was at a gun show --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- set up a little table there -- sold 70 cigars in just a matter of three or four hours.

KATHY MONROE: Oh, great.

JOHN MARTIN: Because we have a lot people coming through there, you know. You can do that at boat shows, you can do that automobile shows, sports memorabilia shows. We do a lot of business that way.

Also, we have the biggest thing with the private labels right now --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- is the Y2K celebrations coming up.

KATHY MONROE: Oh, all right.

JOHN MARTIN: A lot of the hotels and bars and restaurants, they all have a special New Year's Eve party --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and they're all going to be advertising them like they do every year except this year it's going to be bigger. And, so, we're doing a lot of private labels with their name and Happy New Year and the Y2K, and all that kind of stuff, private label cigars --

KATHY MONROE: Hmmm.

JOHN MARTIN: -- which some of these places if you spend like $100 bucks they'll give you dinner, a bottle of champagne --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and a free cigar, you know.

KATHY MONROE: Yeah.

JOHN MARTIN: And, so, that's another thought because right now -- and, by the way, if you were to get into this business now --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- it's the perfect time because November and December are traditionally our best months --

KATHY MONROE: Okay.

JOHN MARTIN: -- because of the holidays.

KATHY MONROE: Right.

JOHN MARTIN: I mean, we sell a lot of gift boxes during the holidays. I mean, half of the cigars

that you get from us always come in gift boxes. These are boxes of 25 cigars, they come in hand-polished, dove-tailed boxes, mahogany, cherry, Spanish ~~feeder~~ CEDAR MV. They come with BRASS MV hinges, I mean, very attractive presentations.

KATHY MONROE: Okay. And you said he used a professional locator at first and then did all of his own later? Is that --

JOHN MARTIN: He used a professional locator, not the one that I'm using now but a different one.

KATHY MONROE: Um-hmm.

JOHN MARTIN: There's several different ones you can use. But he started off that way because a locator will teach you how to locate on your own.

KATHY MONROE: Okay.

JOHN MARTIN: And, so, once you do that, then you go out THERE MV and get your locations in the future. Or, if you want, you can get them to come in and do it, you know.

But the interesting thing about that part of it is that a professional locator can set you up immediately. If you were to do 24 accounts on your own, even if you were a great sales person --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and you had a great presentation, it might take you a month to get 24

locations because of the time limitations.

KATHY MONROE: Okay.

JOHN MARTIN: But they'll come out and get it for you in two days.

KATHY MONROE: Okay.

JOHN MARTIN: That's the way it's set up. The core of the business and you've got an on-going money-making machine in the meantime, and then when it's time for you to expand you could always do it on your own, you know.

KATHY MONROE: Okay.

JOHN MARTIN: So, that's -- that's part of it, but here's the bottom line that I wanted to bring to your attention. If the -- the 24 -- if you were to do this, would an investment of around $16 or $17,000 to start up be in the ballpark for you?

KATHY MONROE: Umm -- I think I could probably do that.

JOHN MARTIN: The reason I say that, to me it makes no difference where you want -- want to start at, what level.

KATHY MONROE: Okay.

JOHN MARTIN: But if you start off at the middle of the program, which is the deluxe 24 program --

KATHY MONROE: Yeah.

JOHN MARTIN: -- that has a number of advantages for you, and if you've got a pencil and a piece of paper let me just give you some figures on that.

KATHY MONROE: Okay.

JOHN MARTIN: First of all, you probably saw the package prices in our literature, right?

KATHY MONROE: Right.

JOHN MARTIN: Okay. The literature prices, basically, it's the $11,995 plus the cost of the locator, so the total start up would be approximately $15,595.

KATHY MONROE: Oh, wait a minute, so this cost doesn't include the locator?

JOHN MARTIN: The package prices are just the distributor and the equipment costs only.

KATHY MONROE: Okay.

JOHN MARTIN: Un-huh. Hold on one second, okay?

KATHY MONROE: Okay.

**(Pause while on hold.)**

JOHN MARTIN: Uh --

KATHY MONROE: I'm sorry -- you know what? I thought -- when I spoke to Dan Reed I think he told me that that cost for the 10 package --

JOHN MARTIN: Um-hmm.

KATHY MONROE: -- one good thing about that is

that it did include the cost of the locator.

JOHN MARTIN: The $7,500?

KATHY MONROE: No, $5,995 plus shipping.

JOHN MARTIN: No, it doesn't.

KATHY MONROE: No, okay.

JOHN MARTIN: No, because the locator, they're a separate company --

KATHY MONROE: Okay.

JOHN MARTIN: -- and they have a separate contract. The formula is real simple, they charge -- I think it's $150 per location.

KATHY MONROE: Okay.

JOHN MARTIN: It's a one-time flat fee.

KATHY MONROE: Okay.

JOHN MARTIN: And it's optional. If you don't want to use them, you don't have to.

KATHY MONROE: Okay.

JOHN MARTIN: But here's the thing about the middle program. If you did $15,595, it would give you the locator fees and everything. However, the Board of -- we have a committee here which is a little board we have that tries to close-out each state as we go along --

KATHY MONROE: Um-hmm.

JOHN MARTIN: We just finished Pennsylvania last week, we're -- we did Georgia last week, also.

We're working on Maryland right now. And, so, if we can close out Maryland by the end of the week, they're willing to take it one step further to give you a little more equity in this thing. Instead of the 24 --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- they would give you 28 -- in other words, 28 display humidors --

KATHY MONROE: Okay.

JOHN MARTIN: -- and instead of 2,400 cigars they'd give you 2,800 cigars. An additional 400 cigars, an additional four humidors. Now, you're talking -- the extra 400 -- well, humidors would actually represent an average of let's say $7 bucks a piece retail --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- an additional $2,800 in profit for you right off the top.

KATHY MONROE: Wow.

JOHN MARTIN: And, secondly, the additional four humidors represented four more locations you could expand into.

As far as what's that worth, well, if you look at the basic starter program, if you say that 10 humidors, 1,000 cigars, is valued at $6,000, then 400 humidors -- 400 cigars with four humidors is -- it's actually about a $3,000 value right there, you know.

KATHY MONROE: Okay.

JOHN MARTIN: It's about a $3,000 value there. So, essentially what this also would do is this: If you go for that level, it also makes you what we call a master distributor, because anybody with more than 20 locations --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- is automatically considered a master distributor and the advantage of that is that they won't put anybody else in Rockville.

KATHY MONROE: Oh, okay.

JOHN MARTIN: It gives you total exclusivity for Rockville and all the surrounding communities until your heart's content, and that gives you absolutely no competition. It gives you a choice of all the best hotels, restaurants, night clubs, bars -- whatever -- and, in fact, when it comes time for you to expand, it's tremendous, because you have no competition at all, and all the good locations will still be available, you know.

KATHY MONROE: Is anybody near me in Maryland? Who's my closest -- who would be the closest distributor to me?

JOHN MARTIN: Hang on one second and we'll get the map out, okay?

KATHY MONROE: Okay.

**(Pause while on hold.)**

JOHN MARTIN: Hello --

KATHY MONROE: I'm sorry -- yeah.

JOHN MARTIN: Okay, I'm sorry, I apologize -- I'm trying to pull it up on the computer here. Okay. Okay, hold on a second here. Okay, so, essentially, what this -- the closest distributor to you now -- this would give you the following, because this actually turns out to be a very interesting distributorship --

KATHY MONROE: Okay.

JOHN MARTIN: It would give you all of Washington, D.C., it would give you Bethesda and Silver Spring, Maryland --

KATHY MONROE: Um-hmm.

JOHN MARTIN: It would give you Arlington, it would give you Alexandria. The closest distributor to you would be to the north in Frederick and to the east ~~in~~ MV Baltimore.

KATHY MONROE: Okay.

JOHN MARTIN: Now, in other words -- and there's one going to be where St. Mary's City is way down south. But, actually, this is probably one of the prime distributorships because it does incorporate the District of Columbia.

KATHY MONROE: Um-hmm.

JOHN MARTIN: And that means -- yeah, because remember one thing about cigars: it's basically something that people on vacation and tourists love. It's a product that is tremendous in hotels and resort areas. And what's Washington known for? You know.

KATHY MONROE: Right.

JOHN MARTIN: I mean, you've got thousands of tourists coming there all year long for all sorts of things, whether it's to visit the Smithsonian or hang out, you know, at the mall. But the main thing is that -- just think of the number of just the hotels available in the area. Just think of how many sports bars there are; think about how many night clubs there are.

If you're willing to drive down to D.C. and service the accounts once a week, you'll get some very prime locations.

KATHY MONROE: Okay.

JOHN MARTIN: I mean, you could start off in the Rockville/Silver Spring area and then eventually expand southwards, you know.

KATHY MONROE: Yeah.

JOHN MARTIN: But what I'm saying to you is that that would give you the total exclusivity and they would not put anybody else in there. They would -- they are going to put -- they have plans to put somebody in

Annapolis --

KATHY MONROE: Okay.

JOHN MARTIN: -- because of the Naval base and all that there --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and it's very popular with the military personnel. I mean, we do a lot of military bases with the cigars.

But, essentially, that's a real primary -- so, the other benefit of being a master distributor besides not having any competition is that every time you place an order, whether it's for equipment or inventory --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- you get automatic 20 percent discount right off the top.

KATHY MONROE: Okay.

JOHN MARTIN: That --

KATHY MONROE: That's a good thing.

JOHN MARTIN: -- well, it adds up to thousands of dollars a year. Let me explain to you. Let's say you've got 28 locations out there --

KATHY MONROE: Okay.

JOHN MARTIN: -- and you're ordering 100 cigars every week for each humidor because you're selling 100 each week --

KATHY MONROE: Okay.

JOHN MARTIN: -- at each location. That's 2,800 cigars you're ordering every week. If you're spending, let's say $2 bucks a piece on these cigars, wholesale --

KATHY MONROE: Okay.

JOHN MARTIN: -- so you're reselling them for $7/$8, I mean, you're talking almost $6,000 in terms of that's the wholesale price of the cigars, right? So, if you're saving 20 percent off of that, that's $1,200 bucks you're saving every time you order.

KATHY MONROE: Yeah.

JOHN MARTIN: It's a huge discount. Over the course of a year, it could add up into tens of thousands of dollars, depending on the volume.

KATHY MONROE: And you said it's only available to people who buy 20 or more --

JOHN MARTIN: Well, it's only available to the master distributorships with exclusivity there and who have 20 or more locations.

KATHY MONROE: Okay.

JOHN MARTIN: Whereas, if you're, for example, in a basic starter program, I mean, that's fine, too. I mean, to me it makes no difference where you start. But if you're planning to eventually -- because there's a lot

of people out there who will -- have a full-time -- I've got a guy who's a top engineer with Microsoft --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and he's got this thing for him and his wife to do on the side. 50 mil He's got 12 -- ten or 12 locations, they do it on the weekend, it's about six/seven hours of work, he's happy with that. He doesn't really have any plans for expanding, you know. He's doing about -- I think he's doing -- said he was doing about -- he did $54,000 last year.

KATHY MONROE: Wow.

JOHN MARTIN: On the average, you know. So, because they've got full-time jobs, they're top executives with -- he's a web page designer and she's an engineer --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and, so, they've got a very nice living, but this is something extra, you know. And, so, some people it's ideal, but if you're going to turn this into something serious, the most popular program is the 24 location program, because if you've got a weekend or three days available to you during the week to do this --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- it's very easily managed, it

automatically puts you into over $100,000 a year.

KATHY MONROE: Okay.

JOHN MARTIN: Now, you know what? This is something where you see the results from the first week, because this business, you don't have to wait a year to see your money. When you get started -- let's say you decide to become a distributor today --

KATHY MONROE: Okay.

JOHN MARTIN: -- your paperwork is sent in tomorrow, let's say, we process it, within 48 hours you get all your equipment, inventory, everything you need.

KATHY MONROE: Okay.

JOHN MARTIN: Secondly, the locator has already met with you by then, and within the next few days you've already picked out your locations.

KATHY MONROE: Okay.

JOHN MARTIN: Now, that means that you're in business by the end of next week.

KATHY MONROE: Wow.

JOHN MARTIN: Completely. So, essentially the week after, seven days or 10 days later, you're going to each one of these locations to collect cash.

KATHY MONROE: Wow.

JOHN MARTIN: So, you starting -- it's a weekly basis. You have to go to these locations once a week.

If 50 cigars are missing from a display humidor, you restock it, you collect your money, you go to the next one.

And -- but let's take a -- a scenario which I think is very conservative, you know, because I'm willing to make you $100 bet, Kathy, that I can take my pickup truck and put a fancy humidor on the back and just go to any busy street corner of Baltimore or Washington, D.C. or Rockville and in an eight-hour period if I put a little sign there that says, "~~DM~~ PREMIUM MV Cigars sold here," I bet you I can sell 3 cigars. What do you say?

KATHY MONROE: I bet you could.

JOHN MARTIN: Okay. Imagine if I put that same humidor in a busy sports bar or a night club or a golf course, right?

KATHY MONROE: Um-hmm.

JOHN MARTIN: So, let's look at the numbers. If you've got 28 locations, right?

KATHY MONROE: Um-hmm.

JOHN MARTIN: And all you sell is just three -- let's say just three cigars a day at each one, how many cigars are you selling? I mean, that's 100 -- that's 84 cigars a day -- at three right? At three?

KATHY MONROE: Um-hmm.

JOHN MARTIN: If you're making a $3 profit,

that's $252 a day.

KATHY MONROE: Wow, that's amazing.

JOHN MARTIN: Seven days a week is almost $1,800 a week. That's just three cigars. Now, remember I told you that anything less than five is considered failure.

KATHY MONROE: Okay.

JOHN MARTIN: Actually, Dan Reed is going to be -- let's say you become a distributor, hopefully -- he'll be your consultant with the company.

KATHY MONROE: Okay.

JOHN MARTIN: In other words, he keeps on top of your sales, he calls you once a week to make sure if you need inventory or whatever and he also keeps abreast of all the sales happening in all your locations. If the location is not producing, he'll be the first one to call the locator and have them come and relocate you.

KATHY MONROE: Oh, good, okay.

JOHN MARTIN: So, if -- actually, realistically, your very first week you should have generated somewhere between $1,800 and $2,800 right off the bat --

KATHY MONROE: Um-hmmm.

JOHN MARTIN: -- with 28 locations. I'm basing that on five sells.

KATHY MONROE: That's a good return.

JOHN MARTIN: Well, it's numbers, you know --

KATHY MONROE: Yeah.

JOHN MARTIN: -- it's numbers. I mean, if I told you, look, you're going to sell three cigars and make $9 bucks, it doesn't sound like a lot. But you've got 28 locations doing the same thing, you know.

KATHY MONROE: Okay.

JOHN MARTIN: It's a numbers game, you know, it's very, very conservative that way. And, so, the key here is that you start seeing income right away from week one. And every week you go back and every week you place your orders for more inventory -- it's a continuous process.

KATHY MONROE: Okay.

JOHN MARTIN: And what you want to do is continuously add more and more locations as you go along so you're constantly building it, you know. And, hopefully, by the end of the year or next year this time, you'll be sitting with 100 locations.

KATHY MONROE: Well, I guess, you know, sounds like one of the most important things would be to have a good location.

JOHN MARTIN: Well, sure, sure. Well, you're in complete charge of the location quality because of --

you have a professional locator coming out there to get the locations for you --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- but, also, if a location is not up to par, if you don't like it, you don't have to take it.

KATHY MONROE: Okay.

JOHN MARTIN: It's at your option. So, in other words, let's say this guy takes you to a fancy night club --

KATHY MONROE: Who is the locator?

JOHN MARTIN: -- and the -- well, in this case we're going to use David Lafond at Precision Marketing.

KATHY MONROE: Okay.

JOHN MARTIN: And I'm going to have him call you so he can explain his angle to you. But he is the one that specializes in all the Hilton Hotels and Embassy Suites all over the country --

KATHY MONROE: What's his name? David what?

JOHN MARTIN: David Lafond -- L A F O N D.

KATHY MONROE: Okay.

JOHN MARTIN: Well, you can also reach him at 1-800 --

KATHY MONROE: Wait, let me write this down -- I'm sorry.

JOHN MARTIN: 1-800 --

KATHY MONROE: 1-800 --

JOHN MARTIN: -- 499 --

KATHY MONROE: -- 499 --

JOHN MARTIN: -- VEND -- V E N D -- like a vending machine.

KATHY MONROE: -- V E -- yeah.

JOHN MARTIN: And David has done about 40 to 45 distributors for me in the last couple of months alone, nationwide.

KATHY MONROE: Okay.

JOHN MARTIN: He's done a lot of distributors -- everyone's been very happy with his work. But he'll come out there and he'll pick locations for you, you know. If you don't -- if he takes you to, say, a fancy night club and the parking lot's got 500 cars in there --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and the place is jammed and people are having a good time eating and drinking and smoking, you know that's a good location, so you're going to take it.

KATHY MONROE: Okay.

JOHN MARTIN: But if he takes you some place where it's not that busy and the parking lot's empty, you're not going to take that one, you know.

KATHY MONROE: Okay.

JOHN MARTIN: So, it's common sense, basically, you know.

KATHY MONROE: Okay.

JOHN MARTIN: I mean, if he takes you to a five-star restaurant or golf course or a Hilton Hotel, those are the type of locations you want, you know.

KATHY MONROE: Okay.

JOHN MARTIN: And -- but more importantly is that he's got to put you in those places anyway because he's got a warranty that he gives you that if you're not happy with the location, he's got to come back and relocate you at no cost.

KATHY MONROE: Okay.

JOHN MARTIN: Now, he's making $150 per location, it's a one-time flat fee.

KATHY MONROE: Okay.

JOHN MARTIN: If he's got to come back and redo all the work all over again --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- how does he make any money? He doesn't, you see. He's got to get it right the first time.

KATHY MONROE: Okay.

JOHN MARTIN: And, basically, how they do that

is that they put you at the very high quality, highly traffic, busy places, you know -- airport gift shop --

KATHY MONROE: Right.

JOHN MARTIN: -- Hilton Hotels --

KATHY MONROE: Okay.

JOHN MARTIN: -- Marriotts, you know. For example, you might have a -- a location at the Piano Bar at the Sheraton, that might be one of them, you know.

KATHY MONROE: Um-hmm.

JOHN MARTIN: You could be at a gentleman's club, you could be at a -- at a, you know, Executive Suite, you could be, for example, in a five-star restaurant, you know. I mean, and there's tons of those in D.C., you know --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and there's lots of them in the Rockville area and all the surrounding communities.

So, you have a lot of area to expand in but the most important thing is that this is one of the primary for cigars because of it's -- it's a perfect product for it. If you were living in Fargo or in North Dakota or in Billings, Montana, I'd say, well, you don't want to start off with that many --

KATHY MONROE: No.

JOHN MARTIN: -- because there might not be 24

bars in Fargo.

KATHY MONROE: Okay. And, so, maybe I'll call him tomorrow.

JOHN MARTIN: Um-hmm.

KATHY MONROE: That would be good.

JOHN MARTIN: Yeah.

KATHY MONROE: And where is he located? Is he on the west -- do you know where he's --

JOHN MARTIN: David Lafond?

KATHY MONROE: Un-huh.

JOHN MARTIN: David Lafond has a field representative right in Rockville --

KATHY MONROE: Okay.

JOHN MARTIN: -- but he is -- his home base is Orlando, Florida.

KATHY MONROE: Okay.

JOHN MARTIN: And he's just doing a job in New York for me right now, ~~because~~ so my I've got a guy up there, Gary, that works for -- Gary -- let me see what his last name is. He's one of the top guys over there -- Gary Caldwell. Gary Caldwell is doing our New York distributor right now.

KATHY MONROE: Okay.

JOHN MARTIN: And as soon as he's done in the next two or three days, he can actually, you know, zip

right over there to where you are and get those done if you become a distributor.

KATHY MONROE: Okay.

JOHN MARTIN: Because he's got a local rep right in the area who's -- who's very familiar with the terrain and area, you know.

But the most important thing with this particular program is that we have 11 distributors in Maryland --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and we're only taking 12 and we're holding one distributorship for you because once they have all 12 distributorships they're not going to accept any more applications.

KATHY MONROE: Okay. Well, I will definitely call Patrick Benton.

JOHN MARTIN: Yeah, please do that. And, in the meantime, I have another person that's interested in your area but we're going to give you first shot at it.

KATHY MONROE: Okay. Well, I'll try to hurry up and, you know --

JOHN MARTIN: Sure, sure. I mean, like I said, you know, you want to ask all the questions you wanted to ask and take your time in terms of that and make sure you're completely happy.

Secondly, here's another thing: once you become a distributor, you actually become part of the family. We don't -- are not here just to sell you a bunch of equipment, you know.

KATHY MONROE: Um-hmm.

JOHN MARTIN: To be quite honest with you, if I sold you 5,000 cigars today, that's a drop in the bucket for us. We did 190,000 sticks last week alone.

KATHY MONROE: Okay.

JOHN MARTIN: However, if you were to order 5,000 cigars from me every week for the next five years, that's a whole different story. That's why we're very interested in you being very successful. If you have a very successful business, that means you're selling a lot of cigars, that means you have to order more cigars every week.

KATHY MONROE: Right.

JOHN MARTIN: And if you're placing the orders, then we're all making money. That's why, like I said, your consultant here would be calling you once a week and making sure all your locations are producing the sales. If they're not, we'll get the locator out there to come move you.

KATHY MONROE: Okay, that'd be great.

JOHN MARTIN: You know? So, it's kind of we

work together. In fact, our distributors use our logo, they use our company name on their business cards. Some even use my 800 number, you know.

KATHY MONROE: Okay.

JOHN MARTIN: So, I mean, it's like you become part of the family and we ensure your success that way.

KATHY MONROE: Oh, great.

JOHN MARTIN: But, give them a call -- and, by the way, did you know that you could put your whole distributorship on a credit card, too, if you wanted to?

KATHY MONROE: No.

JOHN MARTIN: You could do that. I -- a funny thing -- today there's a guy called me up and said that he wanted to get a master distributorship for Cleveland and put the whole thing on his American Express card.

KATHY MONROE: Oh, that's fast.

JOHN MARTIN: I said why did you do it that way? And here's his logic, right? And I thought this was the greatest thing I ever heard. He says, you know, John, I can give you $16,000 now or I can give it to MasterCard -- or American Express, rather -- 60 days from now.

KATHY MONROE: Oh, that makes sense.

JOHN MARTIN: I said, okay, that makes sense. I said -- he said here's -- another thing -- because I'm

going to have him up and running within two weeks, right?

KATHY MONROE: Un-huh.

JOHN MARTIN: He said, if I'm up and running within two weeks, I still a month and a half of sales before that credit card bill is even do.

Now, if I've got 24 locations and I'm selling just three cigars a day at each one, that first month alone I'm making $6,480 --

KATHY MONROE: Wow.

JOHN MARTIN: -- with 24 locations. In the month and a half, I'm making about $10 grand. I can literally pay most of that bill from the profits from the first month and a half of sales without a dime coming out of my own pocket.

He said so that by using my credit card, I've used leverage, I've used other people's money to start a business, the concept of OPM, you know --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- and I've also used my card to make money instead of spend it. And he says if I decide to pay Master -- American Express all at once 60 days from now, then there's no interest anyway. It's a -- it's an interest-free loan then for two months.

KATHY MONROE: That's great -- good idea.

JOHN MARTIN: But the one -- there's two ways

you can use a credit card: one is buy a wide-screen, color TV and watch it depreciate and pay high interest. Another way is to start a business, you know?

I'm sure in the past you've heard of people who bought real estate with credit cards, right? I mean, it's leverage because you're using that 60-day float to get --

KATHY MONROE: Um-hmm.

JOHN MARTIN: -- into business, you know, an investment.

But that's an option because the company does accept all the major credit cards, you know. So, if you want to do it that way, that would -- you know, you could do the whole thing over the phone, if you want.

KATHY MONROE: Okay.

JOHN MARTIN: But, hang on a second, Dan wants to say hello to you, because he hasn't talked to you at all these last few days.

KATHY MONROE: Okay.

JOHN MARTIN: And -- because he would be your consultant here, hopefully, when you do become a distributor for us.

KATHY MONROE: Okay.

JOHN MARTIN: But I appreciate your calling me back and I have this open for you, but let me know the

next day or so if you could.

KATHY MONROE: I will.

JOHN MARTIN: Okay. I appreciate it. If you have any other questions, just jot them down so you don't forget.

KATHY MONROE: Okay, thanks a lot.

JOHN MARTIN: It will be my pleasure to take as much time as you need to go over it with you. Don't thank me now, basically, Kathy, you thank me after your first week in business, how's that?

KATHY MONROE: Okay.

JOHN MARTIN: (Laughter.) Hang on a second, okay?

KATHY MONROE: Okay.

**(Pause while on hold.)**

---

**TELEPHONE CONTACT WITH DAN REED**

DAN REED: Hello?

KATHY MONROE: Yes?

DAN REED: Hey, you talked to the vice president of the company while I was on vacation, huh?

KATHY MONROE: He sounds like a nice guy.

DAN REED: (Laughter.) Yeah, he is. How you

doing?

KATHY MONROE: I'm well, and you?

DAN REED: Oh, pretty good. You ready to roll up your sleeves --

KATHY MONROE: Uh --

DAN REED: -- and go to work?

KATHY MONROE: I'm close to it.

DAN REED: Good, good.

KATHY MONROE: It does sound very appealing.

DAN REED: Oh, no, it's good. If you're looking to do something in vending, this is -- there's no better plan in the market, no question about it. I mean, you know, it's a business actually that's gone a long way; it's a business that you're dealing now with a new generation of cigar smokers out there in the marketplace; and, of course, you know, just take a look at who's involved in the business, you know, and that tells you -- that tells you everything, you know.

But a master's distributorship is pretty good because you've got the whole area there from all the way to D.C., everything.

KATHY MONROE: Yeah.

DAN REED: And, of course, those are all premium cigar smokers, you know, they'll spend $5 or better for a cigar, you know?

KATHY MONROE: I think they will.

DAN REED: Oh, I know they will. I know they will. It's a very good area. But, anyway, okay, fine. So --

KATHY MONROE: I'll be in touch with you. I was going to --

DAN REED: Un-huh.

KATHY MONROE: -- Patrick Benton.

DAN REED: Patrick Benton?

KATHY MONROE: Yeah.

DAN REED: Oh, he's a distributor, yeah.

KATHY MONROE: Correct.

DAN REED: Oh, it's okay for you to call him?

KATHY MONROE: That's what Mr. Martin said.

DAN REED: Oh, okay, fine, because a lot of our distributors don't want, you know, don't want to talk to people, you know, they figure it's none of their business. But, no, as long as he gave you -- if he said it was okay, it's okay. Usually we have to ask their permission, you know?

KATHY MONROE: Okay.

DAN REED: Yeah, just like if you became a distributor and somebody wanted to talk to you, I'd have to call you first. I couldn't just give your phone number out, you know?

KATHY MONROE: Yeah, I'd understand that.

DAN REED: But that's good. Yeah, give him a call -- give him a call.

KATHY MONROE: Okay.

DAN REED: Yeah, if you're going to be there for a while, I'll have David Lafond call you. Did you speak to him? The locator?

KATHY MONROE: No, I just got his name from Mr. Martin.

DAN REED: Oh, okay. You're at home now?

KATHY MONROE: I'm at home now, but I'm about to go out.

DAN REED: Oh, you're going out? Okay.

KATHY MONROE: So, that's my concern. But I'll be home later, maybe around -- after 9:00.

DAN REED: Okay, I'll tell him.

KATHY MONROE: That's getting sort of late, but I'll, you know, if I'm not here, you can just leave a message --

DAN REED: Yeah, yeah.

KATHY MONROE: -- and, in any event, I'll call him tomorrow.

DAN REED: All right, great.

KATHY MONROE: Okay?

DAN REED: All right.

KATHY MONROE: Thanks a lot.

DAN REED: Glad -- glad talking to you again, and, anyway, I'll speak to you again.

KATHY MONROE: Thanks a lot.

DAN REED: All right.

KATHY MONROE: Bye-bye.

DAN REED: Bye-bye now.

**(End of conversation.)**

**(End of taping session.)**

CERTIFICATION OF TYPIST

DOCKET/FILE NUMBER: P984405

CASE TITLE: VENDING SWEEP

TAPING DATE: NOVEMBER 1 & 2, 1999

TRANSCRIPTION DATE: NOVEMBER 3, 1999

I HEREBY CERTIFY that the transcript contained herein is a full and accurate transcript of the tapes transcribed by me on the above cause before the FEDERAL TRADE COMMISSION to the best of my knowledge and belief.

DATED: NOVEMBER 3, 1999

DIANE QUADE

CERTIFICATION OF PROOFREADER

I HEREBY CERTIFY that I proofread the transcript for accuracy in spelling, hyphenation, punctuation and format.

ELIZABETH M. FARRELL



# Old Dominican
## TOBACCO CO.

# FORMULA FOR SUCCESS

4801 S. University Drive, Suite 3090W
Davie, Florida 33328
Toll Free: 800-334-0946 • Local: 954-252-0029 • Fax: 954-680-4245

ATTACHMENT C

4801 S. University Drive
Suite 3090W
Ft. Lauderdale, Fl 33328
(800)-334-0946

# OLD DOMINICAN TOBACCO

October 25, 1999

Dear Mrs. Morris:

Thank you for your interest in what we believe to be the best business opportunity of the 90's and the coming new century: Premium Cigars!

Old Dominican Tobacco is currently in the process of screening applicants for premium cigar routes in selected areas nationwide. There may be a limited number of opportunities available for qualified entrepreneurs throughout the United States, and now is the time to get started.

With the sincere interest you have shown in owing and operating your own business and the questions you have, we have determined that you are the type of person the company is looking for at this time.

Enclosed you will find the package we discussed. I hope you will find it informative.

If you are seriously seeking an investment in the fast growing industry of the decade and are financially prepared, don't wait. The Premium Cigar Industry and their revenues will be with us for a long time, but this opportunity won't be. We sincerely hope that you are the kind of person we are looking for right now in your area!

Sincerely

Dan Reed

Regional Director

# OLD DOMINICAN TOBACCO

*Old Dominican Tobacco, Inc. is a distributor and importer of premium hand rolled cigars and* accessories. We are servicing many fine tobacconists, liquor stores and tobacco wholesalers throughout the United States.

We have the program for you! The traditional way to sell cigars is to open a cigar store. Doing this, you must acquire a properly located retail store and sign a long-term lease. You'll have high rent (in a good location); you will need to hire help, unless you can be at your store 12 hours a day and 7 days a week. You've got utilities, advertising, insurance, workman's compensation; oh yes now it's time to buy inventory, etc., etc., etc. At minimum, it would cost $125,000.00 to open a store in a desirable location, and your eggs would be in one basket...

NOT ANYMORE. With our program, you will be able to supply 10 or more retail outlets, without all *the expenses of the stores. The retailer/merchant is selling your product and you only have to pay him a* commission. You need no special vehicle to service the accounts and it only takes minutes to do so...You could potentially have 100 retail outlets selling your cigars and it would take less time to service your accounts than to operate one store. Compare your income versus your investment.

Our program is a winner. Call your representative back immediately. Don't lose out. This is the opportunity you've been looking for!

The cigar explosion, 2900% growth in 2 years, nearly 100% of today's adult population is a potential customer, humidors are easily placed in thousands of locations in your area, **NO COMPETITION**...**Ground floor opportunity** with unlimited growth, all cash business, humidors are durable, reliable and are virtually maintenance free. Our cigars are the most desirable in the industry.

This is your opportunity to participate in a real business with a real product line. You owe it to yourself to get involved in the hottest business of the decade. We have programs starting as low as $5,995.00. Deal direct with the source.

We have learned that other companies are charging $8,500.00 all the way up to $20,000.00 for the same or similar program to ours at only $5,995.00. Deal directly with us, your source.

We want you to make money. The only way we will be successful with this program is if you are making money. Our program is priced so low to our participating entrepreneurs that the way our company makes money is on the reorders for our products.

You owe it to yourself to get involved in the hottest boom industry of the decade.

# OLD DOMINICAN TOBACCO

## MARKETING STRATEGY

Currently, cigars are sold by alcohol and tobacco distribution networks developed by cigar manufacturers. Retail sales of cigars have expanded from the traditional tobacconist to a wide variety of other retailers, including direct channels such as mail order catalogs and the Internet. While there are many machine-made cigar manufacturers/distributors with established dominance in the mass market, there is no clear leader for the premium hand-rolled cigar mass market.

Until recently, targeted cigar buyers have been the upper income set, with promotions focusing on business, golf and special interest markets. These targeted buyers generally buy from tobacconists and represent the 5-15% of the cigar smokers that would be considered educated buyers. Most of these buyers purchase according to a particular brand preference. Additionally, these buyers are more likely to purchase by the box rather than by the piece.

With the renewed interest in cigars, World Wide Web sites, in-flight catalogs and direct mail marketing collateral have featured cigars and accessories. These channels have targeted more of the middle to upper-income class. This and the race for storefront channel distribution represent the two most coveted markets for new companies.

The strength of Old Dominican Tobacco, Inc. is distribution. Recent cigar public offerings have been made by manufacturers of premium cigars, with a noticeable absence in the distribution structure required to solidly capture the market with actual sales. Old Dominican is of the opinion that a strong niche exists for a distribution company offering competitive prices, stocking wholesalers and guaranteed supply. Old Dominican utilizes the 25-year old distribution structure which utilizes direct sales to corporate and regional franchise offices and to stocking wholesale distributors. This structure offers a significant competitive edge over cigar companies which have no direct sales force or interaction with wholesalers.

# *Cigar Business Benefits*

1. **Immediate Cash Flow** with no lean years (recession proof ). Income begins in the very first month.

2. **All Cash business** (no bad checks, credit risks, or accounts receivable).

3. **A year-round business** (no seasonal fluctuations of income).

4. **Being your own boss.**

5. **Variable hours** - you set your own schedule.

6. **No personal selling** of product required.

7. **No advertising costs.**

8. **No office overhead** (no rent, utilities, etc. - work out of your own home instead of an expensive office).

9. **No employees to pay** (no wages, F.I.C.A., unemployment, or workman's compensation taxes, etc.)

10. **Product that is always in demand and consumed** - offering repeat business.

11. **Merchandising through many established businesses** rather than just a single location (all your eggs are not in one basket).

# The Facts on the Cigar Industry

- Most Premium cigars are all tobacco with no tar.

- Americans smoked 4.6 billion cigars last year.

- In 1994, Premium cigar imports to the USA were only 204 million.

- In 1996, Imports of premium cigars rose to 5.8 billion.

- From January to May 1995, imports of premium cigars increased 31.6%

- Growth in the industry was over 134% in 1996

- Projections for sales in the USA are 10 billion by 1998

- The largest growing segment of premium cigar smokers is the 19-40 year olds

- Premium cigars are promoted by many of the finest hotels and resorts such as the Ritz Carlton, Omni, Four Seasons, Marriott and many more

- More and more restaurant and service business are noticing the demand for premium cigars and are boosting sales and satisfying the need.

- There's a boom in cigar dinners being promoted by upscale food and dining establishments.

- Premium cigars have become a status symbol with actors, politicians, stockbrokers and "ladder-climbing" executives in the USA.

- Women cigar smokers say, "smoking cigars makes them feel feminine".

- An estimated 20% of the premium cigar smokers are women.

- The average amount spent by premium cigar smokers weekly is $42.00

- The average price for a premium cigar is $7.95



# Why should I invest in Premium Cigars?

**Fact:** The premium cigar business has grown 2900% since 1994.

**Fact:** Cigar bars and diners are quickly becoming commonplace in all major cities.

**Fact:** Premium Cigars have become a symbol of stature among actors, executives, and politicians.

**Fact:** The Cigar Association of America reported an explosion in sales of premium cigars.

**Fact:** Millions of Premium cigars are imported each month to satisfy the ever increasing demand.

**Fact:** Cigar sales jumped from 204 million in 1994 to an incredible 5.8 billion in 1998.

**Fact:** The average money spent each week by a cigar smoker is $35.00 (41 % spend $25.00 or more).

**Fact:** Premium cigars have become so popular, they are now promoted through fine hotels such as Ritz Carlton, Omni, J.W. Marriott's, Four Seasons as well as major celebrities worldwide.

**Fact:** **Now is the time to get involved!**

# U.S DEPARTMENT OF LABOR COMPARES HOURLY INCOME

## HOW DOES YOUR INCOME COMPARE TO THE AVERAGE OWNER/OPERATOR?

**GROSS WEEKLY INCOME:**

- **Factory Worker**
  **$7.04 per hour X 40 hours = $281.60**
- **Salesperson**
  **$8.16 per hour X 40 hours = $326.40**
- **Plumber**
  **$12.00 per hour X 40 hours = $480**

**NET WEEKLY INCOME FOR AN OWNER OF A CIGAR ROUTE (based on 15 routes):**

- **15 humidors X 5 sales with an average profit $3.12 X 7 days per week = $1638.00 working 5 hours per week.**

The above analysis is intended to help future owner/operators and should not be construed as an earning claim nor is it presented as an inducement.

Source: U.S. Department of Labor

# Old Dominican Tobacco Co.

## PACKAGE PRICES

### BASIC STARTER PROGRAM

10 DISPLAY HUMIDORS (Up to a 100 cigars each)
1000 mix Coronas, Robustos, Churchills, Torpedos
10 Cigar Cutters

**Your Cost: $5,995 Plus Shipping**

### DELUXE 24 PROGRAM

24 DISPLAY HUMIDORS (up to a 100 cigars each)
2400 mix of Coronas, Robustos,Churchills,Torpedos
24 Cigar Cutters

**Your Cost: $11,995 Plus Shipping**

### GRANDE 40 PROGRAM

40 DISPLAY HUMIDORS (up to a 100 cigars each)
4000 mix of Coronas, Robustos, Churchills, Torpedos
40 Cigar Cutters

YOUR COST: $16,995 Plus Shipping

INCLUDED WITH ALL PROGRAMS:
Point of sale material - Poduct knowledge material
Marketing material - Product support

*LIMITED AVAILABILITY*
***CALL NOW:* Toll Free: (800) 334-0946**

## REVENUE PROJECTIONS

### BASIC PROGRAM

| PER LOCATION | | | PER 10 LOCATIONS | |
|---|---|---|---|---|
| Sales | per day | Monthly | 10 Locations | Annually |
| 2 | $6.00 | $180.00 | $1,800.00 | $21,600.00 |
| 3 | $9.00 | $270.00 | $2,700.00 | $32,400.00 |
| 5 | $15.00 | $450.00 | $4,500.00 | $54,000.00 |
| 10 | $30.00 | $900.00 | $9,000.00 | $108,000.00 |

### DELUXE PROGRAM

| PER LOCATION | | | PER 24 LOCATIONS | |
|---|---|---|---|---|
| Sales | per day | Monthly | 24 Locations | Annually |
| 2 | $6.00 | $180.00 | $4,320.00 | $51,840.00 |
| 3 | $9.00 | $270.00 | $6,480.00 | $77,760.00 |
| 5 | $15.00 | $450.00 | $10,800.00 | $129,600.00 |
| 10 | $30.00 | $900.00 | $21,600.00 | $259,200.00 |

### GRANDE PROGRAM

| PER LOCATION | | | PER 40 LOCATIONS | |
|---|---|---|---|---|
| Sales | per day | Monthly | 40 Locations | Annually |
| 2 | $6.00 | $180.00 | $7,200.00 | $86,400.00 |
| 3 | $9.00 | $270.00 | $10,800.00 | $129,600.00 |
| 5 | $15.00 | $450.00 | $18,000.00 | $216,000.00 |
| 10 | $30.00 | $900.00 | $36,000.00 | $432,000.00 |

These figures are only estimates of typical cigar revenues. Your income may vary from these. There is no guarantee of your income

# $$ Cigar Profit Worksheet $$

Example of profit:

| | | |
|---|---|---|
| *Sales price of cigars* | = | $7.00 |
| *Less your cost of product* | = | - $2.50 |
| *Less location commission* | = | - $1.50 |
| **Net profit per cigar** | = | **$3.00** |

$3.00 profit x 6 sales per day = **$18.00 profit per day, per humidor**
$18.00 profit x 15 humidors = **$270.00 per day profit!!**
$270.00 per day x 5 days = **$1350.00 per week profit!!**
$1350.00 per week x 52 weeks = **$70,200.00 profit per year!!**

| Cigars sold daily @ $3.00 profit per cigar | Daily profit per humidor | Annual profits* 10 units | Annual profits* 15 units | Annual profits* 20 units | Annual profits* 30 units |
|---|---|---|---|---|---|
| 2 sales | $6.00 | $18,600 | $27,900 | $37,200 | $55,800 |
| 4 sales | $12.00 | $37,200 | $55,800 | $74,400 | $111,600 |
| 6 sales | $18.00 | $55,800 | $83,700 | $111,600 | $167,400 |
| 7 sales | $21.00 | $65,100 | $97,650 | $130,200 | $195,300 |
| 9 sales | $27.00 | $83,700 | $125,550 | $167,400 | $251,100 |
| 11 sales | $33.00 | $102,300 | $153,450 | $204,600 | $306,900 |
| 13 sales | $39.00 | $120,900 | $181,350 | $241,800 | $362,700 |
| 15 sales | $45.00 | $139,500 | $209,250 | $279,000 | $418,500 |

*Annual profits are based on 310 business days in a year.

Please note that these figures are estimates and do not represent a guarantee of income. They merely demonstrate potential earnings based on a certain number of products sold on a yearly basis. Actual figures cannot be accurately predicted. Your commitment to servicing the units regularly will let YOU determine the limits of your success.

# BE YOUR OWN BOSS WITHOUT FEAR!

## INCREASE YOUR INCOME (FT/PT)

Today some people in the USA are realizing a dream. We all reach out for the finer things in life...better homes, cars, conveniences, education for our children, holiday vacations, etc.

Often, our finances fall short of allowing us to obtain these things. Therefore, we look for some way to increase our income. Some of us take a second job. This second job may sound good, but it can also put a squeeze on our hours. However, a part-time business permits us to be our own boss. We can work when we want and expand our business as we want.

What keeps so many of us from taking that first step towards financial independence? Just one thing...FEAR!

*A fear of:*
*Losing our savings-no matter how small the investment. Getting mixed up with a "fly-by-night" outfit or a "get-rich-quick" scheme.*

*These fears could be eliminated if we:*
*Handle a product that sells in large volume. Handle a self-serve product. Do no selling. Deal with a reputable, reliable, national company who has the right program and products.*

## ASK YOURSELF:

Am I tired of working for someone else and making money for them?
Would I rather put my efforts to work for my benefit?
Do I want to earn better than average income?
Do I have a minimum of six hours a week to devote to earn extra income?
Am I an honest, dependable person?
Can I prosper with a well-known product line and an excellent marketing concept?
Can I make my own decisions?

*If you have answered no to any of these questions, __GO NO FURTHER.__*
*You are destined to stay where you are...*

*BUT!!! If you have that certain something to be a successful entrepreneur, please go further!!!*

*CALL US NOW AT (800) 331-4747*

- Even In America Only 1 Man In 500 At Age 65 Will Have As Much As $24,000. • U.S. Dept. of Labor
- 85 Out Of 100 Reaching Age 65 Do Not Possess As Much As $250. • Social Security

# "I Can't INVEST Now"

| If you do not adopt a plan for your future, and stay with it... the odds are against you as follows: | AT AGE 65 | 75% Of the American people are dependent on relatives, friends and charity!<br>23% Are still working!<br>2% Are Financially Independent! |
|---|---|---|

***Age 18 to 25*** "Me invest? Are you kidding? I've just received my education. You can't expect me to invest now. I'm young and I want to have a good time. When I get out of school I'll start investing."

***Age 25 to 35*** You don't expect me to invest now, do you? Remember, I've only been working a few years. Things will be looking up soon, and then I'll be able to invest. Right now I have to dress well in order to make a good impression. Wait till I'm a little older. There's plenty of time.

***Age 35 to 45*** How can I invest now? Married, children to care for...why, I never had so many expenses in my life. When the children are a little older, I can start thinking of investing."

***Age 45 to 55*** "I wish I could invest now, but I just can't do it. I have two children in college and it's taking every cent and more to keep them there. I've had to go into debt the past few years to meet the college bills. But that won't last forever, and then I can start investing."

***Age 55 to 65*** "I know I should be investing now, but money is tight. It's not so easy for a man my age to better himself. About all I can do is hang on. Why didn't I start to invest twenty years ago? Well, maybe something will turn up."

***Age Over 65*** "Yes, it's too late now. We are living with our eldest son. It isn't so nice, but what else can we do? We have Social Security, but who can live on that? If only I had invested when I had the money."

# OUTSTANDING TAX BENEFITS!!!

*It's not how much money you make that's important...*
*It's how much you keep!*

## IMPORTANT TAX INFORMATION

A business owner, or distributor, may depreciate ("write-off") the cost of equipment purchased for a business. Recent laws passed by Congress says that up to $17,500 of business equipment purchased by a distributor can be deducted from taxable income in the FIRST year.

Business owners have always enjoyed the benefits of the business "write off". As a business owner, you can deduct the following costs from your gross income:

| Personal | House | Travel | Automobiles |
|---|---|---|---|
| Business lunches | Rent/Mortgage Interest | Entertainment Expenses | Fuel Expense |
| IRA Contributions | Taxes | Education | Repairs |
| Retirement Savings | Telephone | Hotels / Motels | Leases |
| Daily Expenses | Utilities | Restaurants | Rentals |
| Telecommunications | Repairs | Transportation | Depreciation |

## KEOGH PLAN – TAX BONUS

Since you must own your own business to make this tax deduction, this valuable tax savings is yours! See your CPA or Accountant for verification and application to your own individual tax situation.

102
101
103

## TARGET LOCATIONS

**Convenience Stores**
**Tourist Shops**
**Hotels**
**Bars & Pubs**
**Food Markets**
**Airport Gift Shops**
**Grocery Stores**
**Drug Stores**
**Cocktail Lounges**
**Private Clubs**
**Truck Stops**
**Bowling Alleys**
**Military Bases**
**Country Clubs**
**Golf Courses**
**Service Stations**
**Restaurants**
**Billiard Parlors**
**Liquor Stores**
**Newsstands**
**Marinas**
**Café's**

Why would someone place a humidor with cigars in their business place? **SIMPLE: BIG PROFIT POTENTIAL WITH NO RISK!!!**

With sales of premium handmade cigars going through the roof, any retailer would love to get in on the money being made. Our displays are designed to take up a minimum amount of counter space, while still delivering a high margin to the retailer. This means that the sales volume and profit potential from our humidors and cigars compares quite favorably with any other use of counter space. You are placing the humidors and cigars in the retailers place of business **free of charge, with no risk!!!**

# Old Dominican Tobaccos, Inc

4801 S. University Drive Suite #3090W
Davie, Florida 33328

Sales: (800) 334-0946
Customer Service: (954) 252-6727
Fax: (954) 680-4245

---

# LOCATING INFORMATION

- Locations are one of the most important aspects of a successful point-of-purchase enterprise.
- Professional locating companies specialize in geographics, demographics and display placement to secure possible locations. They investigate, evaluate vital information, and incorporate it into their assessment in order to meet your needs as distributor.
- A top professional locating company shall be referred to you. They will explain their operations and your available options.
- Calling the locating company enables you to make a sound business decision, based on the situation at that time. This emphasis on getting you the **"right information at the right time"** is just one of the ways in which we strive to provide you with the best possible service.

## WHY OUR OWNERS DO SO WELL

- Nationally advertised products
- Flexible hours
- Full-time, part-time or absentee ownership
- Excellent return on investment
- Huge tax advantages
- State-of-the art, low maintenance equipment
- Humidor's never become obsolete
- Very light work
- Very little overhead
- Low initial investment
- Immediate cash income
- Ten year factory warranty
- Customer service hot-line

Do you have at least five spare hours per week to gather the money from your accounts and carry it to the bank?

# Old Dominican Tobaccos, Inc

4801 S. University Drive Suite #3090W
Davie, Florida 33328

Sales: (800) 334-0946
Customer Service: (954) 252-6727
Fax: (954) 680-4245

---

HOW TO SERVICE YOUR ROUTE
(Based on a 15 stop route)

You, as a distributor, should service your sites on a weekly basis. It takes about 10 – 15 minutes to collect your money, restock your cigars and clean your humidor.

It should take no more than 10 minutes to drive between locations. So multiply 15 minutes by the number of humidors you start with. For instance, you know it takes 15 minutes x 15 humidors or 225 minutes = 3.75 hours weekly. Plus 1 hour per week to count your revenue, take your money to the bank and purchase your cigars.

1. Clear top on all unit
2. 10 year warranty
3. Proven product - Cigars
4. Very light work
5. Huge potential income
6. At home or in office training
7. Turn-Key operation



FREE
Tobacco Times

Atlanta's Cigar and Pipe Review
Volume 1/ Number 10

Our Top 10 Cigars

| Brand & Style | Size | Overall Rating |
|---|---|---|
| Gilberto Oliva | Robusto Maduro | 4.5 |
| Victor Sinclair | Figurado | 4.5 |
| Astral | Besos | 4.0 |
| Avo | #9 | 4.0 |
| Victor Sinclair | Churchill | 4.0 |
| Prof. Sila | Excelencia | 4.0 |
| Royal Jamaica | Giant Corona | 4.0 |
| Gilberto Oliva | Robusto | 3.5 |
| Macanudo | Hyde Park Cafe | 3.5 |
| La Gloria | Wavell | 3.5 |



Tabacalera Don Rafael S.A.

Proudly Presents Our Celebrity Collection

OSCAR NOMINEE & GOLDEN GLOBE WINNER

Burt Reynolds

Like a great brandy improves with age

the Burt Reynolds Cigar has

also reached its time – experience one of the most extraordinary lines of Cigars & Accessories

BR

   



*Victor Sinclair and Don Rafael Hand-made Dominican cigars from*

# OLD DOMINICAN TOBACCO COMPANY

## *Don Rafael* Hand-made; filler – Dominican; binder – Dominican.

Available in Maduro & Connecticut wrappers.

| Cigar | Size | Packing |
|---|---|---|
| #17 Petite Corona | 6 x 42 | Packed 25 to a box. |
| #27 Lonsdale | 6 x 44 | Packed 25 to a box. |
| #37 Corona | 6 x 46 | Packed 25 to a box. |
| #47 Robusto | 4 1/2 x 50 | Packed 25 to a box. |
| #57 Robusto | 5 1/2 x 50 | Packed 25 to a box. |
| #67 Churchill | 7 1/2 x 50 | Packed 25 to a box. |
| #77 Toro | 6 x 54 | Packed 25 to a box. |

## *Victor Sinclair Cigar* Hand-made; filler – 80% Dominican, 20% Cuban seed.

Available in Maduro & Connecticut wrappers.

| Cigar | Size | Packing |
|---|---|---|
| Churchill | 7 1/2 x 50 | Packed 25 to a box. |
| Robusto #1 | 5 1/2 x 50 | Packed 25 to a box. |
| Robusto #2 | 4 1/2 x 50 | Packed 25 to a box. |
| Lonsdale | 6 x 44 | Packed 25 to a box. |
| Corona | 6 x 46 | Packed 25 to a box. |
| Pyramid (20) Natural | 7 x 36 x 54 | Packed 20 to a box. |
| Pyramid (20) Maduro | 7 x 36 x 54 | Packed 20 to a box. |

## *Victor Sinclair Grand Reserve* Hand-made;

*filler – 35% Dominican, 65% Cuban seed; binder – Dominican.*

Available in Maduro wrappers only.

| Cigar | Size | Packing |
|---|---|---|
| Panatela (10) | 7 x 38 | Packed 10 to a box. |
| Figurado (15) | 5 x 46 | Packed 15 to a box. |
| Belicoso (15) | 5 3/4 x 52 | Packed 15 to a box. |
| Pyramid (3) | 6 x 54 | Packed 3 to a box. |
| Torpedo (3) | 5 3/4 x 52 | Packed 3 to a box. |

## *Vintage Select* Hand-made; 100% Cuban seed.

Available in Maduro wrappers only.

| Cigar | Size | Packing |
|---|---|---|
| Robusto #1 | 4 1/2 x 50 | Packed 25 to a box. |
| Robusto #2 | 5 1/2 x 50 | Packed 25 to a box. |
| Corona | 6 x 44 | Packed 25 to a box. |
| Double Corona | 7 x 48 | Packed 25 to a box. |
| Churchill | 7 1/2 x 50 | Packed 25 to a box. |

## *Flavored Cigars*

| Cigar | Packing |
|---|---|
| Chateau Amaretto | Packed 25 to a box. |
| Rum Royale | Packed 25 to a box. |
| Vanilla Delight | Packed 25 to a box. |

Flavored cigars are also available in bundles.

# CREDIBILITY

When it comes to *Investing Money* or deciding on a ***Business Opportunity*** the credibility of a company is an extreme important issue these days. At **Old Dominican Tobacco Company** we pride ourselves on our integrity, our excellent reputation and tremendous success as a supplier of cigars and humidors.

The following are important facts concerning Old Dominican Tobacco, Company.

**Old Dominican Tobacco Company** is a Florida Corporation Registered with The State of Florida Secretary of State.

**Old Dominican Tobacco Company** is registered with the State of Florida under the "Sale of Business Opportunity Act". Our registration number is AIN 99-052. with no complaints.

**Old Dominican Tobacco Company** is registered with the State of Florida "Department of Business & Professional Regulations Alcoholic Beverage & Tobacco" Lic#TOB-1616086

Our motive when working with distributors is to sell cigars & humidors. Therefore, our intention and goal is to make sure each and every Distributor is **SUCCESSFUL.** Each Cigar Vendor is a treasured client of **Old Dominican Tobacco Company** with whom we can continue to sell cigars and humidors. We look forward to becoming your supplier of Cigar, Humidors and Accessories.

Banking Affiliation – Nations Bank , Davie Banking Center
FL6-800-01-01

Corporation Attorney- Peter G. Gruber, P.A.
Datran Center, Miami, Fl.

Accountant - Binstock Rubin,Ellzer & Company
Datran Center, Miami, Fl.

# Wholesale Prices

## Premium Hand Rolled Dominican Cigars

(Prices Subject to Change/Does not include shipping charges 10-99)

| Brand | Type | Size | Qty | Unit | Sugg Retail |
|---|---|---|---|---|---|
| Don Rafael | | | | | |
| | Churchill | 7 ½ x 50 | Packed 25 | 2.75 | 7.50 |
| | Robusto | 5 x 50 | Packed 25 | 2.65 | 7.95 |
| | Toro | 6 x 54 | Packed 25 | 2.40 | 5.95 |
| | Corona | 6 x 46 | Packed 25 | 2.40 | 5.95 |
| Flavored Cigars (Emigrante) | | | | | |
| | Vanilla, Chocolate, Black Cherry | | Packed 25 | 2.50 | 6.95 |
| | Cognac, Hazelnut, Cinnamon | | Packed 25 | 2.50 | 6.95 |
| | Rum Royale, Chateau Amaretto | | Packed 25 | 2.95 | 7.95 |
| Lamborghini Diablo Classico | | | | | |
| | Churchill | 7 ½ x 50 | Packed 25 | 2.95 | 7.95 |
| | Torpedo | 5 x 52 | Packed 25 | 2.95 | 7.95 |
| | Corona | 6 x 46 | Packed 25 | 2.00 | 6.95 |
| | Robusto | 5 x 50 | Packed 25 | 2.00 | 6.95 |
| Tamboril | | | | | |
| | Churchill | 7 ½ x 50 | Boxed 25 | 3.00 | 8.95 |
| | Robusto | 5 x 50 | Boxed 25 | 2.95 | 7.95 |
| Davidoff | | | | | |
| | Churchill | 7 ½ x 50 | Packed 25 | 4.95 | 10.95 |
| Victor Sinclair | | | | | |
| | Churchill | 7 ½ x 50 | Packed 25 | 2.95 | 6.75 |
| | Robusto #2 | 4 ½ x 50 | Packed 25 | 2.75 | 5.95 |
| | Figuardo | 5 x 46 | Packed 15 | 4.95 | 10.95 |
| | Corona | 6 x 46 | Packed 25 | 2.75 | 5.95 |
| Cohiba | | | | | |
| | Call for Current Market Prices | | | | |
| Cuban Delights: | | | | | |
| | Robusto | 5 x 50 | Packed 25 | 1.95 | 4.95 |
| Emigrante: | | | | | |
| | Churchill | 7 ½ x 50 | Packed 25 | 2.50 | 6.95 |
| Moran: | | | | | |
| | Corona | 6 x 46 | Packed 25 | 1.65 | 4.50 |
| | Churchill | 7 x 50 | Packed 25 | 1.75 | 4.75 |
| | Robusto | 5 x 50 | Packed 25 | 1.65 | 4.50 |
| Victor Sinclair-*Especiales* | | | | | |
| | Robusto | 5 x 50 | Packed 25 | 1.20 | 3.95 |
| | Lonsdale | 6 x 44 | Packed 25 | 1.20 | 3.95 |
| | Churchill | 7 ½ x 50 | Packed 25 | 1.50 | 4.50 |

*Note: All Other Brands Call for Prices*

Cards

**DISCLOSURE REQUIRED BY FLORIDA LAW**

The State of Florida has not reviewed and does not approve, recommend, endorse or sponsor any business opportunity. The information contained in the disclosure has no been verified by the the state. If you have any questions about this investment see an attorney before you sign a contract or agreement.

# TABLE OF CONTENTS
## AIN # 99-052

**Pursuant to 16 CFR 436.1 *et seq.*, a Trade Regulations Rule of the Federal Trade Commission regarding Disclosure Requirements and Prohibitions Concerning Franchising Business Opportunity Ventures, the following information is set forth with respect to OLD DOMINICIAN TOBACCOS, INC., for you examination.**

1. IDENTIFYING INFORMATION AS TO OLD DOMINICAN TOBACCOS, INC. .............. Pg.4
2. BUSINESS EXPERIENCE OF OLD DOMINICAN TOBACCOS, INC.'S DIRECTORS AND EXECUTIVE OFFICERS .......... Pg.4
3. BUSINESS EXPERIENCE OF OLD DOMINICAN TOBACCOS, INC .......... Pg.4
4. LITIGATION HISTORY .......... Pg4/5
5. BANKRUPTCY HISTORY .......... Pg.5
6. DESCRIPTION OF THE BUSINESS OPPORTUNITY .......... Pg.5
7. INITIAL FUNDS REQUIRED TO BE PAID TO YOU .......... Pg.5
8. RECURRING FUNDS REQUIRED TO BE PAID BY YOU .......... Pg.5
9. AFFILIATED PERSONS WITH WHOM YOU ARE REQUIRED OR ADVISED TO DO BUSINESS BY OLD DOMINICAN TOBACCOS, INC .......... Pg.5
10. OBLIGATIONS TO PURCHASE .......... Pg.5
11. REVENUES RECEIVED BY OLD DOMINICAN ROBACCOS, INC. IN CONSIDERATION OF PURCHASES BY YOU .......... Pg.5
12. FINANCING ARRANGEMENTS .......... Pg.6
13. RESTRICTION OF SALE .......... Pg.6
14. PERSONAL PARTICIPATION REQUIRED BY YOU IN THE OPERATION OF YOUR BUSINESS .......... Pg.6
15. TERMINATION, CANCELLATION & RENEWAL OF YOUR BUSINESS OPPORTUNITY..Pg.6/7
16. STATISTICAL INFORMATION CONCERNING NUMBER OF BUSINESS OPPORTUNITIES..Pg.7
17. SITE SELECTION .......... Pg.7
18. TRAINING PROGRAMS .......... Pg.7
19. PUBLIC FIGURE INVOLVEMENT IN THE BUSINESS OPPORTUNITY .......... Pg.7
20. FINANCIAL INFORMATION INVOLVEMENT IN THE BUSINESS OPPORTUNITY .......... Pg.7
21. FINANCIAL INFORMATION CONCERNINC OLD DOMINICAN TOBACCOS, INC .......... Pg.7

EXHIBIT "A" – PURCHASE ORDER .......... Pg.8

EXHIBIT "B" – FINANCIAL INFORMATION OF THE COMPANY .......... Pg.9

## 1. IDENTIFYING INFORMATION AS TO OLD DOMINICAN TOBACCOS, INC.

The name and the address of the company you will be doing business with is:

Old Dominican Tobaccos, Inc.
4801 S. University Drive
Suite 3090W
Davie, Florida 33328

**Old Dominican Tobaccos, Inc.** intends to do business using the name **Old Dominican Tobaccos, Inc.** and there are no trademarks, tradenames, service marks, advertising or other commercial symbols which identify goods, commodities or services to be offered, sold or distributed by any prospective buyer, or under which you will be operating. **Old Dominican Tobaccos, Inc.** sells cigar humidors, cigars, cigar cutters, display item's and product information and sells these items as a business opportunity.

**Old Dominican Tobaccos, Inc.**, is organized under the laws of the State of Florida. **Old Dominican Tobaccos, Inc.** does not have a parent firm. **Old Dominican Tobaccos, Inc.**, does not have a holding company. Under the Purchase Order, **Old Dominican Tobaccos, Inc.** does not grant to you the right to *utilize the* ***Old Dominican Tobaccos, Inc.*** *tradename or trademark.* You must operate under your own name or other fictitious name or assumed name that may *not* include the **Old Dominican Tobaccos, Inc.** trade name. **Old Dominican Tobaccos, Inc.** may, however, permit the utilization of certain graphic art work connection with your display.

**Old Dominican Tobaccos, Inc.**, may be considered a "business opportunity venture" under *Title 16 Code of Federal Regulations* Sections 436.1 to 436.3, a Trade Regulation Rule of the Federal Trade Commission Regarding Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures (the "FTC Franchise Rules"). The FTC Franchise Rules require the preparation of this disclosure Statement, which must be delivered to a prospective purchaser on or before a first personal meeting. The prospective purchaser must have this Disclosure Statement at least 10 business days and the completed Purchase Order at least 5 business days before any money is paid to **Old Dominican Tobaccos, Inc.**, or any agreement, including the Purchase Order, is signed by a prospective purchaser.

*In addition*, **Old Dominican Tobaccos, Inc.**, is considered a "business opportunity seller" under various states' business opportunity laws and a seller of "seller-assisted marketing plans" under several other states' seller-assisted marketing plan laws. These laws generally require that this Disclosure Statement must be registered by a state agency before sales can take place in that state or to a resident of that state. If you are a resident of a state or purchasing a business opportunity in a state having these type of laws (there are currently 26 states), a state addendum may be included immediately after the FTC cover page.

**Old Dominican Tobaccos, Inc.** is not a product franchisor or a business format franchisor. Many of the disclosure items required by the FTC Franchise Rules, therefore, do not apply and are so noted. **Old Dominican Tobaccos, Inc.** will be referred to as **Old Dominican Tobaccos, Inc.**, rather than the franchiser. You will be referred to as "you" rather than a franchise. The business purchased will be referred to as a business opportunity rather than a franchise.

## 2. BUSINESS EXPERIENCE OF OLD DOMINICAN TOBACCOS, INC.'S DIRECTORS AND EXECUTIVE OFFICERS

The Business experience during the past 5 years of **Old Dominican Tobaccos, Inc.**'s current directors and executive officers, including their principal occupations and prior employers, is as follows:

Neil Young is the sole shareholder, officer and director of **Old Dominican Tobaccos, Inc.** During the past five years Mr. Young has owned and operated American Tangibles Limited, Inc. and Nationwide Rarities, Inc. both the sellers of rare coins. Mr. Young has also owned and operated American Animation Investments, Inc., a company engaged in the sale of animated cells. American Animation Investments, Inc. changed its name on February 27, 1995 to Fine Arts Original Brokerage Corporation and in addition to its existing business, sold other forms of artwork to the public at large.

## 3. BUSINESS EXPERIENCE OF OLD DOMINICAN TOBACCOS, INC.

**Old Dominican Tobaccos, Inc.**, was incorporated on January 27, 1998. This is the first time that **Old Dominican Tobaccos, Inc.**, has sold these products in this manner. **Old Dominican Tobaccos, Inc.**, does not itself operate business opportunities of the type being sold. **Old Dominican Tobaccos, Inc.** has not sold any business opportunities where a service mark or trademark is used, and has not offered or sold business opportunities and/or products in other lines.

## 4. LITIGATION HISTORY

Neither the Seller nor any other person listed in ITEM 2 above.

A. Has, at any time during the previous ten (10) fiscal years, been convicted of a felony or pleaded nolo contendere to a felony charge if the felony involved fraud (including violation of any franchise law, or unfair or deceptive practices law), embezzlement, fraudulent conversion, misappropriation of property, or restraint of trade;

B. No person or entity listed in item 1 or 2 above is subject to any currently effective State or Federal agency or court injunctive or restrictive order, is a party to a proceeding currently pending in which such order is sought, relating to or affecting business opportunities activities or the business opportunity seller purchaser relationship or involving fraud (including any violation of franchise or business opportunity law or unfair or deceptive practices law), embezzlement, fraudulent conversion, misappropriation of property, or restraint of trade.

## 5. BANKRUPTCY HISTORY

During the previous ten (10) fiscal years, neither the Seller nor any person listed in ITEM 2 above has: filed a petition for bankruptcy, been adjudged bankrupt, been reorganized due to insolvency, or been a principal, director, executive officer, or partner of any other person that has so filed or was so adjudged or reorganized, during or within one (1) year after the period that held a position in the other person.

## 6. DESCRIPTION OF THE BUSINESS OPPORTUNITY

**Old Dominican Tobaccos, Inc.**, offers prospective purchasers the opportunity to enter into the cigar distribution business. You will be provided with the equipment and knowledge necessary to begin the business. You will receive the selected number of humidors, cigars, cigar cutters, display paraphernalia and informational products ordered. You will operate your own business and use the equipment and merchandise provided as desired. You operate your business and use these items as you see fit. **Old Dominican Tobaccos, Inc.** will not interfere in the day-to-day operation of your business nor require you to buy any product from it or any affiliate, if any. The market for the product is varied depending location. If **Old Dominican Tobaccos, Inc.** fails to deliver the products, equipment, or supplies necessary to begin substantial operation of the business within thirty (30) days for the delivery date stated in your Purchase Order, you may notify **Old Dominican Tobaccos, Inc.** in writing and cancel your Purchase Order.

## 7. INITIAL FUNDS REQUIRED TO BE PAID BY YOU

The total that you will pay to **Old Dominican Tobaccos, Inc.** is the purchase price set forth on your Purchase Order. The minimum purchase is for ten (10) fully equipped humidors at a total of Five Thousand Nine Hundred Ninety-five and oo/100 ($5,995.00) Dollars. It must be paid at the signing of the Purchase Order. The initial Business Opportunity Fee is non-refundable except in accordance with the state laws in effect in the Purchaser's state of residence. There are no other financial obligations to **Old Dominican Tobaccos, Inc. Old Dominican Tobaccos, Inc.** has no direct interest in any locating company and offers no "buy backs" or money-back guarantees or refunds. There is no franchise fee paid.

## 8. RECURRING FUNDS REQUIRED TO BE PAID BY YOU

There are no recurring funds required to be paid by you to **Old Dominican Tobaccos, Inc. Old Dominican Tobaccos, Inc.**, however, will continue to sell you additional cigars at its then currently scheduled pricing. You are free, however, to attempt to acquire cigars from others.

## 9. AFFILIATED PERSONS YOU ARE REQUIRED TO DO BUSINESS WITH BY OLD DOMINICAN TOBACCOS, INC.

There are no affiliated persons with whom you are required or advised to do business by **Old Dominican Tobaccos, Inc.**

## 10. OBLIGATIONS TO PURCHASE

The initial items must be purchased from **Old Dominican Tobaccos, Inc.** Thereafter, there is no obligation to purchase anything from **Old Dominican Tobaccos, Inc.**, in the future. As stated above, however, **Old Dominican Tobaccos, Inc.** will continue to offer to sell cigars to you at its then currently scheduled pricing.

## 11. REVENUES RECEIVED BY OLD DOMINICAN TOBACCOS, INC. IN CONSIDERATION OF PURCHASES BY YOU

**Old Dominican Tobaccos, Inc.** derives income from the sale of humidors, cigars, cigar cutters, display paraphernalia and informational products only through mark-ups in the price charges to purchase of these items. **Old Dominican Tobaccos, Inc.** receives no rebates from you or any locating company on your purchase of products. **Old Dominican Tobaccos, Inc.** does not receive any other revenue from any other supplier. **Old Dominican Tobaccos, Inc.** may compensate distribution for their time and long distance telephone charges when they have agreed to talk to prospective distributors about their experience in the cigar distribution business and specifically with **Old Dominican Tobaccos, Inc.**

## 12. FINANCING ARRANGEMENTS

There are no financing arrangements offered to you directly or indirectly by **Old Dominican Tobaccos, Inc.**, its agents or affiliated persons on initial purchases. **Old Dominican Tobaccos, Inc.** does not offer or supply, either directly or indirectly, any other financing to you on initial purchases **Old Dominican Tobaccos, Inc.** makes no representations as to your ability to secure financing for the operation of the business opportunity or as to the terms of financing. Any financing given on additional purchases will depend on the purchaser's credit.

**Old Dominican Tobaccos**, Inc. derives no income or payment from any person offering financing to a prospective purchaser nor from any person arranging for financing for you.

## 13. RESTRICTION OF SALES

You are not limited to the products that you may sell, nor are you limited to the customers to whom you may sell. **Old Dominican Tobaccos, Inc.** may award certain exclusive geographical territories to its customers. You will be informed of any exclusive territorial restrictions that may affect you prior to you purchase.

## 14. PERSONAL PARTICIPATION REQUIRED OF YOU IN THE OPERATION OF YOUR BUSINESS

The Purchase Order does not require any specific level of participation by you in the operation of the business opportunity. You may operate the business opportunity or hire others to operate the business opportunity. You may secure your own retail locations or engage the services of a professional marketing company. **Old Dominican Tobaccos, Inc.** does not direct the management nor the methods by which you run your business. The amount of time which you devote to your business is solely in your discretion.

## 15. TERMINATION, CANCELLATION AND RENEWAL OF YOUR BUSINESS OPPORTUNITY

A. *Term.* The Purchase Order contains no term. The obligations of **Old Dominican Tobaccos, Inc.** are satisfied upon delivery of the initial order of the items ordered. You have no further obligations to **Old Dominican Tobaccos, Inc.** (except as stated in the Purchase Order) and **Old Dominican Tobaccos, Inc.** has no further obligation to you.

B. *Conditions Under Which You May Renew or Extend.* Since there is no Purchase Order, there is no renewal or extension of the Purchase Order, however, **Old Dominican Tobaccos, Inc.** will continue to offer additional items to you, whenever you wish, upon your signing of **Old Dominican Tobaccos, Inc.'s** then current form of Purchase Order.

C. *Conditions Under Which Old Dominican Tobaccos, Inc. May Refuse to Renew or Extend.* **Old Dominican Tobaccos, Inc.** will only refuse to sell additional items to you if you have failed to pay for previous purchases as required under the Purchase Order or if **Old Dominican Tobaccos, Inc.** is no longer offering items for sale.

D. *Conditions Under Which You May Terminate.* You may terminate the Purchase Order if more than thirty (30) days have elapsed since the signing of the initial Purchase Order, and **Old Dominican** Tobaccos, Inc. has failed to ship the items ordered. In this event, the funds paid will be returned to you. Thereupon, the Purchase Order shall be automatically terminated and neither **Old Dominican Tobaccos, Inc.** nor you have any further obligation to the other. You may terminate the business opportunity after the initial Purchase Order by simply ceasing to operate.

E. *Conditions Under Which Old Dominican Tobaccos, Inc. May Terminate.* **Old Dominican Tobaccos, Inc.**, is entitled to terminate the Purchase Order upon your failure to prepay for the items described in the Purchase Order.

F. *Your Obligations After Termination of the Purchase Order.* Upon termination of the Purchase Order you have no obligations to **Old Dominican Tobaccos, Inc.** except to cease identifying yourself as an "Authorized Distributor for **Old Dominican Tobaccos, Inc.** Products."

G. *Conditions Under Which Old Dominican Tobaccos, Inc. May Repurchase Whether by Right of First Refusal or Option of Old Dominican Tobaccos, Inc.* **Old Dominican Tobaccos, Inc.** has no right of first refusal or option to purchase your business opportunity.

H. *Assets Conditions Under Which You May Sell or Assign Your Interest in the Business Opportunity or in the of the Business Opportunity.* You may sell, assign, give, transfer, lease, sublease or encumber, in whole or in part, the business opportunity, any ownership or control of your business and your assets without **Old Dominican Tobaccos, Inc.'s** written consent.

I. *Conditions Under Which Old Dominican Tobaccos, Inc. May Sell or Assign in Whole or in Part Its Interest in the Business Opportunity.* There is no provision in the Purchase Order that restricts **Old Dominican Tobaccos, Inc.** from selling or assigning the Purchase Order in whole or in part.

J. *Conditions Under Which Old Dominican Tobaccos, Inc. May Modify the Purchase Order.* **Old Dominican Tobaccos, Inc.** may modify a signed Purchase Order only by written mutual consent of you and **Old Dominican Tobaccos, Inc.**

K. *Conditions Under Which You May Modify the Purchase Order.* You may modify a signed Purchase Order only by written consent of you and **Old Dominican Tobaccos, Inc.**

L. *Rights of Your Heirs or Personal Representatives Upon Your Death or Incapacity.* Your heirs and personal representatives will have, upon assumption of the Purchase Order, the same rights and obligations under the Purchase Order as you have.

M. *Provisions of Covenant Not to Compete.* The Purchase Order does not contain a covenant not to compete.

## 16. STATISTICAL INFORMATION CONCERNING THE NUMBER OF BUSINESS OPPORTUNITIES AND SELLER-OWNED OUTLETS

Your relationship with **Old Dominican Tobaccos, Inc.** is not that of a franchise. As of January 1, 1999 there were no business operating similar to yours. There have been no business terminated. There have been no businesses reacquired.

## 17. SITE LOCATION

Seller does not provide placements and/or location assistance to Purchasers.

## 18. TRAINING PROGRAMS

There is no formal training program. You are invited to visit **Old Dominican Tobaccos, Inc.**'s offices in South Florida at your expense and meet with representatives of **Old Dominican Tobaccos, Inc.**, to have any questions answered and, upon request and at no extra charge, all reasonable support possible will be given to you.

## 19. PUBLIC FIGURE INVOLVMENT IN THE BUSINESS OPPORTUNITY

No public figure or personality is used in the name of the business opportunity nor is there any endorsement or recommendations of the business opportunity by a public figure in advertisements. No public figure or personality is involved in the business opportunity by way of investment or management in any way.

## 20. FINANCIAL INFORMATION CONCERNING OLD DOMINICIAN TOBACCOS, INC.

Attached is a copy of **Old Dominicans Tobaccos, Inc.**, Financial Statement of May 26, 1999.

# Old Dominican

## TOBACCOS, INC.

4801 S. University Drive, Suite 3090 W. Davie Florida 33328

## Standard Purchase Order

AIN # 99-052

uyer's Name: ______________________________

ddress: ______________________________

ity: ____________________ State: ____________ Zip: ____________

ome Phone: ____________________ Business Phone: ____________________

| Qty | Description of Product and/or Equipment | Unit Price | Total |
|---|---|---|---|
| | Commercial Humidors (100-125 cigar capacity) | | |
| | Assortment of Premium Cigars | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | Shipping and Handling | | |
| | Sub-Total | | |
| | Less Deposit | | |
| | TOTAL | | |

**Total amount due prior to shipment**

**Funds are to be certified check or money order**

ıyer acknowledges the receipt of all Disclosure documents of Seller ten (10) business days prior to acceptance and deposit of funds.

ıe Seller agrees to sell and Buyer agrees to buy equipment described above at the prices specified on the terms and conditions a set forth on the ont and back of this agreement.

ocations: The location of this equipment is the sole and exclusive responsibility of Buyer. Seller may recommend a location company, but the urchaser agrees and understands that he is free to hire, or not hire any location company.

I WITNESS WHEREOF, this agreement has been duly executed by the parties on the date set forth adjacent to the signatures of each party. Buyer as read, front and back, fully understands and accepts this agreement.

ccepted and Approved:

Date: ____________________ Buyer: ______________________________

Date: ____________________ Seller: ______________________________

The parties acknowledge this agreement is subject to the terms set forth on the reverse

white copy Seller - yellow copy Buyer

PURCHASE AGREEMENT

ld Dominican Tobaccos, Inc. (hereinafter referred to as the "Seller") agrees to sell and the individual affixing their signature to the reverse (front) de of this agreement (hereinafter referred to as the "Buyer") agrees to buy the equipment and/or product (hereinafter referred to as the "Equipment") escribed at the price described on the reverse side on the following terms and conditions.

. The Seller agrees to ship the Product and /or Equipment within thirty (30) business days from the receipt of the fully executed Purchase greement accompanied by full payment in the form of a cashier's check, certified check, money order or bank wire transfer. Delivery shall be ubject to and contingent upon strikes, labor difficulties, fire, storm, delay or defaults of common carriers, failure or curtailment to the Seller's normal ource of supply, government decrees of orders, an/or any other delays beyond Seller's reasonable control and Seller shall not be liable for any loss r damage arising therefrom. Buyer may cancel the order by written notice delivered to Seller prior to shipment if the order is not shipped within iirty (30) Business cays of receipt of this fully executed Purchase Agreement and cleared paid in full funds from the Buyer. Title to the Product and/ r Equipment shall not pass to the Buyer until total amount due is paid in full. Equipment purchased are for business purposes only. Delivery to the itended location and installation or placement of the Equipment are the Buyer's sole and exclusive responsibility. All Equipment is sold F.O.B., om Seller's warehouse.

. All Equipment (Humidors) is sold subject to the respective manufacturer's guarantees to replace or the options of the manufacturer, to epair any Equipment found to be defective in material or workmanship within two(2) years from the date of purchase, F.O.B. manufacturer's cation. Buyer agrees, understands and acknowledges that in no event shall Seller be liable for consequential or special damages or for transportation, stallation, re-installation adjustments, or other expenses, that may arise in connection with the Equipment. This warranty is expressly made ion eu of any and all other warranties , expressed or implies, including any warranties of merchantability and fitness for a particular purpose.

. This Purchase Agreement is intended by Buyer and Seller as a complete and final expression of the entire Purchase Agreement between ie parties and as a complete and exclusive statements of its terms and conditions. Buyer acknowledges having read front and back of the urchase Agreement with a clear understanding of all of its terms and provisions. Buyer acknowledges that Buyer has had the opportunity to seek dependent council to explain the terms and conditions contained in this Purchase Agreement which constitutes the entire understanding between ie parties. Buyer agrees that he/she is not relying upon any verbal or written representation whatsoever, except as expressly set forth in this urchase Agreement. Buyer acknowledges and agrees that Seller does not guarantee or represent that the Equipment, when installed, will uarantee any minimum earnings as the earnings from the Equipment are rendered by the Buyer, all of which factors are beyond the control of the eller. No other promises, offers, representations, agreements or understandings of any kind shall be binding upon Seller unless made in writing nd signed by an officer of Seller. Buyer understands and agrees that Seller has not offered and does not offer any agreements to re-purchase, uyback, money back guarantees or refunds. Except as otherwise provided herein, upon the approval of a sale by Seller, all deposits are non-efundable. Seller reserves the right to modify and/or upgrade changes in packaging and product content for the betterment of the product line. rior usage in trade of the Equipment shall be relevant or admissible to supplement the intention or the meaning of this Purchase Agreement. Buyer grees to comply with all Federal, State and Municipal laws relating to Buyer's business. Buyer agrees not to engage in any intentional, unlawful or egal trade practices or business activity. This Purchase Agreement can only be modified in writing, signed by Buyer and Seller, or their duly uthorized agents.

. Buyer shall be responsible for all Federal, State and Local taxes as well as all licenses required to do business and shall act as an idependent entity in all matters concerning Buyer's business.

. As the business of each Buyer is private, Seller agrees not to disclose its customers records without legal process.

. Seller will provide Buyer with items as herein provided for the specified price determined. Seller shall ship F.O.B. warehouse to the Buyer's ddress as stated herein. In addition, Seller will give Buyer an opportunity to purchase additional products upon request by Buyer.

. Buyer agrees, understands and acknowledges as follows:

a) that its relationship with Seller is that of a buyer to a distributor and that a distributor is defined as a purchaser of goods from seller.

b) that it is a Buyer's sole and exclusive responsibility to place and display any and all Equipment sold to Buyer by Seller.

c) that it is Buyer's sole and exclusive responsibility to independently engage others, if Buyer so desires, to assist Buyer in locating suitable sites to display Equipment.

d) that Seller, in an effort to assist Buyer, may recommend one or more firms engaged in the business of assisting others in finding suitable locations for the display or installation of Equipment, however, the decision to engage any such firm is at the Buyers sole and exclusive discretion. Accordingly, Seller accepts no responsibility for Buyer's decision to engage any such firm or for the decision to place Equipment at any particular location.

. Any dispute that arises in connection with this Purchase Agreement or the transaction contemplated by it shall be determined by the State f Florida. Exclusive venue for the resolution of any dispute shall be in Broward County, Florida.

. It is acknowledged by Buyer that this is not a franchise offering nor a security offering and involves only the purchase of products and quipment. Buyer is free to sell any items of Equipment or accessories and does not have to purchase any such items at any time from Seller. uyer acknowledges that Seller has not secured locations for the Equipment nor provided the services of a person to do so, and Buyer is not equired to pay Seller for any such services.

0. Buyer hereby acknowledges having received, and read this Purchase Agreement not less than seventy-two (72) hours prior to the time of xecution.

1. Buyer hereby acknowledges reading, agreeing to and understanding each and very one of the terms and conditions, front and back of this urchase Agreement.

2. Seller agrees to appoint and maintain during the term of this Agreement, an agent for the receipt of service of process within the State o lorida with respect to such action arising out of or based upon the relationship between Seller and Buyer. Seller's agent for service at the presen me is Peter G. Gruber, P.A. 9100 South Dadeland Blvd., Suite 910, Miami, Florida 33156. Seller reserves the right to change its agent for service t any time and will provide written notice of Buyer if such an event occurs prior to the completion of any sale.

3. Buyer may cancel this purchase order for any reason by mailing written notice of same to Seller if, and only if, said notification is postmar ithin five (5) days of Seller's receipt of payment in full.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 SEP -6

U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES OF AMERICA,

PLAINTIFF,

v.

K.V. HILL, individually,
and d/b/a SOUTHEASTERN PHOTO SUPPLY, INC.;
JAMES D. CARTER, individually,
and d/b/a SOUTHEASTERN PHOTO SUPPLY, INC.

DEFENDANTS.

Civil Action No.: CV-00-J-302-S

ENTERED
SEP 6 2000

**JUDGMENT AND ORDER OF PERMANENT INJUNCTION**

On February 7, 2000, a Complaint for Civil Penalties, Consumer Redress, and Permanent Injunction against the defendant, K.V. Hill, was filed in this Court by the plaintiff, the United States of America. The Complaint alleged, inter alia, that the defendants were selling franchises without complying with the requirements of the Federal Trade Commission's (the "FTC" or "Commission") Franchise Rule, 16 C.F.R. § 436. Defendant Hill was personally served with a summons and complaint but failed to appear or defend, and was found in default by the Court on August 23, 2000.

Because there is no just reason to delay, pursuant to Rules 54 and 55 of the Federal Rules of Civil Procedure, it is appropriate to enter judgement against K.V. Hill.

17

GOVERNMENT
EXHIBIT
B

THEREFORE, the Court being fully advised in the premises, it is hereby

ORDERED, ADJUDGED, AND DECREED as follows:

## FINDINGS

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345 and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57b.

2. Venue is proper as to all parties in the Northern District of Alabama.

3. The activities of the defendant are in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4. The Complaint states a claim upon which relief may be granted against the defendant, under Sections 5(a), 5(m)(1)(A), 9, 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 49, 53(b), and 57b.

5. Entry of this Order is in the public interest.

## DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

1. "Business Venture" means any written or oral business arrangement, however denominated, whether or not covered by the Franchise Rule, which consists of the payment of any consideration for:

   a. The right or means to offer, sell, or distribute goods or services (whether or not identified by a trademark, service mark, trade name, advertising, or other commercial symbol); and

b. The promise or provision of assistance to any person in connection with: (1) the establishment, maintenance, or operation of a new business; or (2) the entry by an existing business into a new line or type of business, including, but not limited to, referrals to one or more persons providing location services.

2. The "Franchise Rule" or "Rule" means the FTC Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions concerning Franchising and Business Opportunity Ventures," 16 C.F.R. Part 436.

3. "Franchise" and "Franchisor" are defined as those terms are defined in Sections 436.2(a) and (c) of the Franchise Rule, 16 C.F.R. § 436.2(a) and (c), and include "business opportunity ventures" as defined in Sections 436.2(a)(1)(ii) and (2) of the Rule, and discussed in the FTC's Final Interpretive Guide for the Franchise Rule, 44 Fed. Reg. 49966-68 (August 24, 1979). The term "franchise" in this Order shall also encompass any successor definition of "franchise," "business opportunity" and "business opportunity venture" in any future trade regulation rule or rules that may be promulgated by the Commission to modify or supersede the Franchise Rule, in whole or part, from the date any such rule takes effect.

4. "Franchise broker" is defined as that term is defined in Section 436.2(j) of the Franchise Rule, 16 C.F.R. § 436.2(j). The term "Franchise broker" in this Order shall also encompass any other entity through which the franchisor sells franchises, including, but not limited to, subfranchisors, master franchisees, or regional franchisees.

5. "Person" means a natural person, organization or other legal entity, including a corporation, partnership, proprietorship, association, or cooperative, or any other group or combination acting as an entity.

6. "Representatives" means the defendant's successors, assigns, officers, agents, servants, employees and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

7. "Telemarketing" means the advertising, offering for sale, or sale of any good or service to any person by means of telephone sales presentations, either exclusively or in conjunction with the use of other advertising.

8. "UFOC format" is defined as the Uniform Franchise Offering Circular disclosure format which has been adopted by the North American Securities Administrators' Association and is now accepted by the Commission for use in lieu of the Franchise Rule's disclosure format.

9. "Defendant" means K.V. Hill.

## ORDER

### I. COMPLIANCE WITH FRANCHISE RULE

IT IS ORDERED, ADJUDGED AND DECREED that, in connection with the advertising, telemarketing, offering for sale, licensing, contracting, sale or other promotion, in or affecting commerce, of a franchise, K.V. Hill and his Representatives are hereby permanently restrained and enjoined from violating, or assisting others to violate, any provision of the Franchise Rule as promulgated, or as it may hereinafter be amended, including, but not limited to:

A. Failing to provide any prospective franchisee with a complete and accurate basic disclosure document containing all the information in the form required by Sections 436.1(a)(1)-(24) of the Franchise Rule, in the manner and within the time frame prescribed by the Rule;

B. Failing to provide any prospective franchisee with an earnings claim document as required by Sections 436.1(b)-(e) of the Franchise Rule, in the manner and within the time frame prescribed by the Rule;

C. Failing to include in any advertisement that states or suggests a specific level of sales, income or gross or net profits that appears in a newspaper or other medium of general dissemination, including the Internet, the disclosures required by Section 436.1(e) of the Franchise Rule, including a clear and conspicuous disclosure of the number and percentage of prior purchasers known to have earned or made the amount claimed;

D. Making any earnings claim or projection without having a reasonable basis for the claim or projection at the time such claim or projection is made, as required by Sections 436.1(b)-(e) of the Franchise Rule; and

E. Engaging in any other act or practice prohibited by the Franchise Rule, 16 C.F.R. Part 436, or failing to fulfill any obligation imposed by the Rule.

*Provided, however,* that if the Commission promulgates a trade regulation rule or rules that modify or supersede the Franchise Rule, in whole or part, the defendant shall comply fully and completely with all applicable requirements thereof on and after the effective date of any such rule; and *provided, further*, that the defendant may choose to comply with the disclosure requirements of the Franchise Rule now in effect by fully and completely complying with the

disclosure requirements set forth in the UFOC format for so long as the current Rule remains in force.

## II. PROHIBITED REPRESENTATIONS

IT IS FURTHER ORDERED that in connection with the advertising, telemarketing, offering for sale, licensing, contracting, sale or other promotion, in or affecting commerce, of any Franchise, Business Venture, or income-generating product or service, the defendant and his Representatives are hereby permanently restrained and enjoined from making, or assisting in the making of, any statement or representation of material fact that is fraudulent, false, or misleading, whether directly or by implication, orally or in writing, including, but not limited to, any or all of the following:

A. The income, profit, or sales volume that a purchaser is likely to achieve;

B. The income, profit or sales volume actually achieved by prior purchasers;

C. The length of time that it is likely to take a purchaser to recoup the entire purchase price or investment;

D. The independence or authenticity of any third-party references, including persons represented to be prior purchasers, that are provided to potential purchasers;

E. The amount of competition within, or a purchaser's territorial rights to, any geographic territory;

F. The availability or existence of profitable locations in a purchaser's geographic area, and

G. The terms and conditions of any assurances, refunds or guarantees of profitability that relate to any location service or company to which a defendant refers a purchaser.

## III. TRANSFER OF CUSTOMER LISTS

IT IS FURTHER ORDERED that the defendant and his Representatives are hereby permanently restrained and enjoined from selling, renting, leasing, transferring or otherwise disclosing the name, address, telephone number, credit card number, bank account number, e-mail address, or other identifying information of any person who paid any money to the defendant at any time prior to entry of this Order, in connection with the advertising, promotion, telemarketing, offering for sale or sale of any Franchise, Business Venture or income-generating product or service; *provided, however,* that defendant may disclose such identifying information to a law enforcement agency, or as required by any law, regulation (including the limited disclosures required by the Franchise Rule) or court order.

## IV. DISTRIBUTION OF ORDER BY DEFENDANT

**IT IS FURTHER ORDERED** that, for a period of five (5) years from the date of entry of this Order, the defendant shall:

A. Provide a copy of this Order to, and obtain a signed and dated acknowledgment of receipt of same from, each officer and director, each individual serving in a management capacity, all personnel involved in responding to consumer complaints or inquiries, and all sales personnel, whether designated as employees, consultants, independent contractors or otherwise, within five (5) business days after receipt of this Order, and thereafter immediately upon employing any such person, for any business that defendant directly or indirectly manage, control, or have a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in these activities; and

B. Maintain for a period of three (3) years after creation, and upon reasonable notice make available to representatives of Plaintiff or the Commission, the original signed and dated acknowledgments of receipt of copies of this Order, as required in Subsection A of this Paragraph.

## V. COMPLIANCE REPORTING BY DEFENDANT

IT IS FURTHER ORDERED that, in order that compliance with the provisions of this Order may be monitored:

A. For a period of five (5) years after the date of entry of this Order, the defendant shall notify the FTC in writing of the following:

1. Any changes in the mailing addresses and telephone numbers of the defendant, within ten (10) days of the date of such change;

2. Any proposed change in the structure of any business entity that the defendant directly or indirectly manages, controls or has a majority ownership interest in, such as creation, incorporation, dissolution (including the dissolution of any subsidiaries), assignment, proposed filing of a bankruptcy petition, or sale or merger resulting in the emergence of a successor corporation, or any other change in that entity, including a change in the corporate name or address, that may affect any compliance obligation arising out of this Order, at least thirty (30) days prior to the effective date of any such change; *provided, however,* that with respect to any proposed change in the structure of any business entity that the defendant directly or indirectly manages, controls or has a majority ownership interest in, about which the defendant learns less than thirty (30) days

prior to the date such action is to take place, the defendant shall notify the Commission as soon as is practicable after learning of such proposed change;

B. One hundred eighty (180) days after the date of entry of this Order, the defendant shall provide a written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which the defendant has complied and is complying with this Order. This report shall include but not be limited to:

1. The then-current residence address, mailing addresses and telephone numbers of the defendant and any business operated by the defendant;

2. The then-current employment and business addresses and telephone numbers of the defendant and any business operated by the defendant, and a description of the business activities of each such Representative;

3. A copy of each acknowledgment of receipt of this Order obtained by the defendant pursuant to Paragraph IV; and

4. A statement describing the manner in which the defendant has complied and is complying with Paragraphs I, II, III and VI of this Order;

C. Upon written request by a representative of Plaintiff or the Commission, the defendant shall submit additional written reports (under oath, if requested) and produce documents on fifteen (15) days' notice with respect to any conduct that is subject to this Order;

D. For the purposes of this Order, defendant shall, unless otherwise directed by a representative of the Commission, identify all written notifications to the FTC as being provided in reference to FTC Matter No. X0023050, Civil No. 00-J-302-S, in the Northern District of Alabama, and mail them to:

Associate Director for Marketing Practices
Federal Trade Commission
600 Pennsylvania Ave. N.W. - Room 238
Washington, DC 20580.

E. For the purposes of this Order, defendant shall, unless otherwise directed by a representative of Plaintiff, identify all written notifications to Plaintiff as provided in reference to DJ# 102-3020, and mail them to:

Director, Office of Consumer Litigation
U S. Department of Justice - Civil Division
P.O. Box 386,
Washington, D.C. 20044

F. For the purposes of this Paragraph V, "employment" includes the performance of services as an employee, consultant, or independent contractor; and "employers" include any individual or entity for whom the defendant performs services as an employee, consultant, or independent contractor; and

G. For purposes of the compliance reporting required by this Paragraph V, Plaintiff and the Commission are authorized to communicate directly with defendant.

**VI. MONITORING COMPLIANCE OF SALES PERSONNEL**

IT IS FURTHER ORDERED that, in connection with any business that the defendant directly or indirectly manages, controls or has a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in these activities, the defendant and its Representatives are hereby permanently restrained and enjoined from:

A. Failing to take reasonable steps sufficient to monitor and ensure that all employees and independent contractors engaged in sales or other customer service functions

comply with Paragraphs I and II of this Order. Such steps shall include adequate monitoring of sales presentations or other calls with customers, and shall also include, at a minimum, the following:

1. Listening to the oral representations made by persons engaged in sales or other customer service functions;

2. Establishing a procedure for receiving and responding to consumer complaints; and

3. Ascertaining the number and nature of consumer complaints regarding transactions in which each employee or independent contractor is involved;

B. Failing promptly to investigate fully any consumer complaint received by any business to which this Paragraph applies; and

C. Failing to take corrective action with respect to any sales person whom the defendant or Representative determines is not complying with this Order, which may include training, disciplining, and/or terminating such sales person;

*Provided, however,* that this Paragraph VI does not authorize or require the defendant to take any action that violates any federal, state, or local law.

## VII. RECORD-KEEPING PROVISIONS

IT IS FURTHER ORDERED that, for a period of five (5) years from the date of entry of this Order, in connection with any business that the defendant directly or indirectly manages, controls or has a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in these activities, defendant and its representatives are hereby restrained and enjoined

from failing to create and maintain for a period of three (3) years following the date of their creation, unless otherwise specified:

A. Books, records and accounts that, in reasonable detail, accurately and fairly reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues;

B. Records containing the name, address, telephone number and social security number of each person employed by the defendant in any capacity, including as an independent contractor, that person's job title or position, the date upon which the person commenced work, and the date and reason for the person's termination, if applicable; *provided, however,* that the businesses subject to this requirement shall retain such records during the employment of any person, and for a period of two (2) years after the date of their termination;

C. Records containing the name, address, telephone number, quantity of goods or services purchased, and a description of the goods or services purchased, for all consumers to whom the business has sold, invoiced or shipped any Franchise, Business Venture or income-generating product or service;

D. Records that reflect, for every written or oral consumer complaint or refund request received by the defendant or his Representatives, whether directly or indirectly or through any third party: (1) the customer's name, address, telephone number; (2) the dollar amount paid by the consumer; (3) the written complaint or refund request, if any; (4) the basis of the complaint or refund request, including the name of any salesperson complained about; (5) the nature and result of any investigation conducted concerning the complaint or refund request; (6) each response and the date of the response to the complaint or refund request; and (7) any final

resolution of the complaint or refund request, and the date of the resolution; and (8) in the event of a denial of a refund request, the reason for the denial; and

E. Copies of all sales scripts, training materials, advertisements, or other marketing materials utilized, which shall be retained for three (3) years after the last date of their dissemination or use.

**VIII. ACCESS TO BUSINESS PREMISES**

IT IS FURTHER ORDERED that for a period of five (5) years from the date of entry of this Order, for the purposes of determining or securing compliance with its provisions, the defendant and his Representatives shall grant to representatives of Plaintiff and the Commission, within three (3) business days of receipt of written notice from Plaintiff or the Commission:

A. Access during normal business hours to any office or facility storing documents of any business that the defendants directly or indirectly manage, control, or has a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in such activities. In providing such access, defendant shall permit representatives of Plaintiff or the Commission to inspect and copy all documents relevant to any matter contained in this Order; and shall permit representatives of Plaintiff or the Commission to remove such documents for a period not to exceed five (5) business days so that the documents may be inspected, inventoried, and copied; and

B The opportunity to interview, without restraint or interference, officers, directors, employees, contractors, and agents, including all personnel involved in responding to consumer complaints or inquiries and all sales personnel, whether designated as employees, consultants,

independent contractors or otherwise, of any business to which Subsection A of this Paragraph applies, regarding compliance with the provisions of this Order. Any person interviewed may have counsel present.

*Provided, however,* that upon application of the Plaintiff or the Commission for good cause shown, the Court may enter an *ex parte* order granting immediate access to defendant's business premises for the purposes of inspecting and copying all documents relevant to any matter contained in this Order.

**IX. AUTHORITY TO MONITOR COMPLIANCE**

IT IS FURTHER ORDERED that the Plaintiff and the Commission are authorized to monitor defendant's compliance with this Order by all lawful means, including but not limited to the following:

A. Plaintiff and the Commission are authorized, without further leave of Court, to obtain discovery from any person (including the defendant) in the manner provided by Chapter V of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 26-37, including the use of compulsory process pursuant to Fed. R. Civ. P. 45, for the purpose of monitoring and investigating defendant's compliance with any provision of this Order.

B. Plaintiff and the Commission are authorized to use representatives posing as consumers or suppliers to defendant, defendant's employees, or any other entity managed or controlled in whole or in part by the defendant, without the necessity of identification or prior notice; and

C. Nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. § 49 and 57b-1, to investigate

whether the defendant has violated any provision herein or Section 5 of the FTC Act, 15 U.S.C. § 45, or any applicable rule or regulation promulgated and enforced by the Commission, including the Franchise Rule, 16 C.F.R. § 436.

## X. FEES AND COSTS

IT IS FURTHER ORDERED that each party to this action shall bear its own costs and attorneys' fees incurred in connection with this action.

## XI. RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for the purpose of enabling the parties to apply to the Court at any time for such further orders and directives as may be necessary or appropriate for the interpretation or modification of this Order, for the enforcement of compliance therewith, or for the punishment of violations thereof.

## XII. CIVIL PENALTY

IT IS FURTHER ORDERED that judgment in the amount of $297,000.00 is hereby entered against the Defendant as a civil penalty, pursuant to Section 5(m)(1)(A) of the Federal Trade Commission Act, 15 U.S.C. § 45(m)(1)(A).

SO ORDERED this 5 day of Sept. 2000.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6221 Civ. Dimitrouleas/Johnson

UNITED STATES OF AMERICA,

PLAINTIFF,

v.

OLD DOMINICAN TOBACCOS, INC.,
a Florida corporation; and
NEIL YOUNG, individually, and as an
officer of the corporation,

DEFENDANTS.
_______________________________________/

**JUDGMENT AND ORDER FOR PERMANENT INJUNCTION**

On February 14, 2000, a Complaint for Civil Penalties, Consumer Redress, and Permanent Injunction against the Defendants, Old Dominican Tobaccos, Inc., and Neil Young, was filed in this Court by the plaintiff, the United States of America. The complaint alleged, inter alia, that the Defendants were selling franchises without complying with the requirements of the Federal Trade Commissions's (the "FTC" or "Commission") Franchise Rule, 16 C.F.R. 436. Defendants were served with the summons and the complaint, but failed to appear or defend, and were found in default by the Court on May 19, 2000. It is appropriate to enter judgment against Defendants.

THEREFORE, the Court being fully advised in the premises, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

**FINDINGS**

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345 and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57b.

2. Venue is proper as to all parties in the Southern District of Florida.

3. The activities of the Defendants are in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4. The Complaint states a claim upon which relief may be granted against the Defendants, under Sections 5(a), 5(m)(1)(A), 9, 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 49, 53(b), and 57b.

5. Entry of this Order is in the public interest.

**DEFINITIONS**

For the purpose of this Order, the following definitions shall apply:

1. "Business Venture" means any written or oral business arrangement, however denominated, whether or not covered by the Franchise Rule, which consists of the payment of any consideration for:

a. The right or means to offer, sell, or distribute goods or services (whether or not identified by a trademark, service mark, trade name, advertising, or other commercial symbol); and

b. The promise or provision of assistance to any person in connection with: (1) the establishment, maintenance, or operation of a new business; or (2) the entry by an existing business into a new line or type of business,

including, but not limited to, referrals to one or more persons providing location services.

2. The "Franchise Rule" or "Rule" means the FTC Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions concerning Franchising and Business Opportunity Ventures," 16 C.F.R. Part 436.

3. "Franchise" and "Franchiscr" are defined as those terms are defined in Sections 436.2(a) and (c) of the Franchise Rule, 16 C.F.R. § 436.2(a) and (c), and include "business opportunity ventures" as defined in Sections 436.2(a)(1)(ii) and (2) of the Rule, and discussed in the FTC's Final Interpretive Guide for the Franchise Rule, 44 Fed. Reg. 49966-68 (August 24, 1979). The term "franchise" in this Order shall also encompass any successor definition of "franchise," "business opportunity" and "business opportunity venture" in any future trade regulation rule or rules that may be promulgated by the Commission to modify or supersede the Franchise Rule, in whole or part, from the date any such rule takes effect.

4. "Franchise broker" is defined as that term is defined in Section 436.2(j) of the Franchise Rule, 16 C.F.R. § 436.2(j). The term "Franchise broker" in this Order shall also encompass any other entity through which the franchisor sells franchises, including, but not limited to, subfranchisors, master franchisees, or regional franchisees.

5. "Person" means a natural person, organization or other legal entity, including a corporation, partnership, proprietorship, association, or cooperative, or any other group or combination acting as an entity.

6.     "Representatives" means the Defendants' successors, assigns, officers, agents, servants, employees and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

7.     "Telemarketing" means the advertising, offering for sale, or sale of any good or service to any person by means of telephone sales presentations, either exclusively or in conjunction with the use of other advertising.

8.     "UFOC format" is defined as the Uniform Franchise Offering Circular disclosure format which has been adopted by the North American Securities Administrators' Association and is now accepted by the Commission for use in lieu of the Franchise Rule's disclosure format.

9.     "Defendants" means the Corporate Defendant and Individual Defendant. The "Corporate Defendant" is Old Dominican Tobaccos, Inc., a Florida corporation. The "Individual Defendant" is Neil Young, individually and as an officer of the Corporate Defendant.

## ORDER

### I. COMPLIANCE WITH FRANCHISE RULE

IT IS ORDERED, ADJUDGED AND DECREED that, in connection with the advertising, telemarketing, offering for sale, licensing, contracting, sale or other promotion, in or affecting commerce, of a franchise, Defendants and their Representatives are hereby permanently restrained and enjoined from violating, or assisting others to violate, any provision of the Franchise Rule as promulgated, or as it may hereinafter be amended, including, but not limited to:

A. Failing to provide any prospective franchisee with a complete and accurate basic disclosure document containing all the information in the form required by Sections 436.1(a)(1)-(24) of the Franchise Rule, in the manner and within the time frame prescribed by the Rule;

B. Failing to provide any prospective franchisee with an earnings claim document as required by Sections 436.1(b)-(e) of the Franchise Rule, in the manner and within the time frame prescribed by the Rule;

C. Failing to include in any advertisement that states or suggests a specific level of sales, income or gross or net profits that appears in a newspaper or other medium of general dissemination, including the Internet, the disclosures required by Section 436.1(e) of the Franchise Rule, including a clear and conspicuous disclosure of the number and percentage of prior purchasers known to have earned or made the amount claimed;

D. Making any earnings claim or projection without having a reasonable basis for the claim or projection at the time such claim or projection is made, as required by Sections 436.1(b)-(e) of the Franchise Rule; and

E. Engaging in any other act or practice prohibited by the Franchise Rule, 16 C.F.R. Part 436, or failing to fulfill any obligation imposed by the Rule.

*Provided, however,* that if the Commission promulgates a trade regulation rule or rules that modify or supersede the Franchise Rule, in whole or part, the Defendants shall comply fully and completely with all applicable requirements thereof on and after the effective date of any such rule; and *provided, further*, that the Defendants may choose to comply with the disclosure requirements of the Franchise Rule now in effect by fully and completely complying with the

disclosure requirements set forth in the UFOC format for so long as the current Rule remains in force.

## II. PROHIBITED REPRESENTATIONS

IT IS FURTHER ORDERED that in connection with the advertising, telemarketing, offering for sale, licensing, contracting, sale or other promotion, in or affecting commerce, of any Franchise, Business Venture, or income-generating product or service, the Defendants and their Representatives are hereby permanently restrained and enjoined from making, or assisting in the making of, any statement or representation of material fact that is fraudulent, false, or misleading, whether directly or by implication, orally or in writing, including, but not limited to, any or all of the following:

A. The income, profit, or sales volume that a purchaser is likely to achieve;

B. The income, profit, or sales volume actually achieved by prior purchasers;

C. The length of time that it is likely to take a purchaser to recoup the entire purchase price or investment;

D. The independence or authenticity of any third-party references, including persons represented to be prior purchasers, that are provided to potential purchasers;

E. The amount of competition within, or a purchaser's territorial rights to, any geographic territory;

F. The availability or existence of profitable locations in a purchaser's geographic area; and

G. The terms and conditions of any assurances, refunds or guarantees of profitability that relate to any location service or company to which a Defendant refers a purchaser.

**III. TRANSFER OF CUSTOMER LISTS**

IT IS FURTHER ORDERED that the Defendants and their Representatives are hereby permanently restrained and enjoined from selling, renting, leasing, transferring or otherwise disclosing the name, address, telephone number, credit card number, bank account number, e-mail address, or other identifying information of any person who paid any money to the Defendants at any time prior to entry of this Order, in connection with the advertising, promotion, telemarketing, offering for sale or sale of any Franchise, Business Venture or income-generating product or service; *provided, however,* that Defendants may disclose such identifying information to a law enforcement agency, or as required by any law, regulation (including the limited disclosures required by the Franchise Rule) or court order.

**IV. DISTRIBUTION OF ORDER BY Defendants**

**IT IS FURTHER ORDERED** that, for a period of five (5) years from the date of entry of this Order, the Defendants shall:

A. Provide a copy of this Order to, and obtain a signed and dated acknowledgment of receipt of same from, each officer and director, each individual serving in a management capacity, all personnel involved in responding to consumer complaints or inquiries, and all sales personnel, whether designated as employees, consultants, independent contractors or otherwise, within five (5) business days after receipt of this Order, and thereafter immediately upon employing any such person, for any business that any Defendant directly or indirectly manages, controls, or has a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in these activities; and

B. Maintain for a period of three (3) years after creation, and upon reasonable notice make available to representatives of Plaintiff or the Commission, the original signed and dated acknowledgments of receipt of copies of this Order, as required in Subsection A of this Paragraph.

**V. COMPLIANCE REPORTING BY Defendant**

IT IS FURTHER ORDERED that, in order that compliance with the provisions of this Order may be monitored:

A. For a period of five (5) years after the date of entry of this Order, the Defendants shall notify the FTC in writing of the following:

1. Any changes in the residence, mailing addresses and telephone numbers of the Individual Defendant, within ten (10) days of the date of such change;

2. Any changes in the employment status (including self-employment) of the Individual Defendant, within ten (10) days of such change. Such notice shall include the name and address of each business that the Individual Defendant is affiliated with or employed by, a statement of the nature of the business, and a statement of the Individual Defendant's duties and responsibilities in connection with the business or employment;

3. Any proposed change in the structure of the Corporate Defendant, or any business entity that the Individual Defendant directly or indirectly manages, controls or has a majority ownership interest in, such as creation, incorporation, dissolution (including the dissolution of any subsidiaries), assignment, proposed filing of a bankruptcy petition, or sale or merger resulting in the emergence of a successor corporation, or any other change in that entity, including a change in the corporate name

or address, that may affect any compliance obligation arising out of this Order, at least thirty (30) days prior to the effective date of any such change; *provided, however,* that with respect to any proposed change in the structure of the Corporate Defendant or any business entity that the Individual Defendant directly or indirectly manages, controls, or has a majority ownership interest in, about which a Defendant learns less than thirty (30) days prior to the date such action is to take place, the Defendant shall notify the Commission as soon as is practicable after learning of such proposed change;

B. One hundred eighty (180) days after the date of entry of this Order, Defendants shall provide a written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which Defendants have complied and are complying with this Order. This report shall include but not be limited to:

1. Each Individual Defendant's then current residence address, mailing addresses and telephone numbers;

2. Each Individual Defendant's then current employment and business addresses and telephone numbers, a description of the business activities of each such employer or business, and the Individual Defendant's title and responsibilities for each such employer or business;

3. A copy of each acknowledgment of receipt of this Order obtained by the Corporate or Individual Defendant pursuant to Paragraph IV; and

4. A statement describing the manner in which the Corporate or Individual Defendant has complied and is complying with Paragraphs I, II, III and VI of this Order;

5. For the purposes of this Paragraph, "employment" includes the

performance of services as an employee, consultant, or independent contractor; and "employers" include any individual or entity for whom any Individual Defendant performs services as an employee, consultant, or independent contractor;

C. Upon written request by a representative of Plaintiff or the Commission, the Defendants shall submit additional written reports (under oath, if requested) and produce documents on fifteen (15) days' notice with respect to any conduct that is subject to this Order;

D. For the purposes of this Order, Defendants shall, unless otherwise directed by a representative of the Commission, identify all written notifications to the FTC as being provided in reference to FTC Matter No. X0023038, Civil No. 00-6221, in the Southern District of Florida, and mail them to:

Associate Director for Marketing Practices
Federal Trade Commission
600 Pennsylvania Ave. N.W. - Room 238
Washington, DC 20580 .

E. For the purposes of this Order, Defendant shall, unless otherwise directed by a representative of Plaintiff, identify all written notifications to Plaintiff as provided in reference to DJ# 102-3028, and mail them to:

Director, Office of Consumer Litigation
U.S. Department of Justice - Civil Division
P.O. Box 386,
Washington, D.C. 20044

F. For the purposes of this Paragraph V, "employment" includes the performance of services as an employee, consultant, or independent contractor; and "employers" include any individual or entity for whom the Defendants perform services as an employee, consultant, or independent contractor; and

G. For purposes of the compliance reporting required by this Paragraph V, Plaintiff and the Commission are authorized to communicate directly with Defendants.

**VI. MONITORING COMPLIANCE OF SALES PERSONNEL**

IT IS FURTHER ORDERED that, in connection with any business that the Defendants directly or indirectly manage, control, or have a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in these activities, the Defendants and their Representatives are hereby permanently restrained and enjoined from:

A. Failing to take reasonable steps sufficient to monitor and ensure that all employees and independent contractors engaged in sales or other customer service functions comply with Paragraphs I and II of this Order. Such steps shall include adequate monitoring of sales presentations or other calls with customers, and shall also include, at a minimum, the following:

1. Listening to the oral representations made by persons engaged in sales or other customer service functions;

2. Establishing a procedure for receiving and responding to consumer complaints; and

3. Ascertaining the number and nature of consumer complaints regarding transactions in which each employee or independent contractor is involved;

B. Failing promptly to investigate fully any consumer complaint received by any business to which this Paragraph applies; and

C. Failing to take corrective action with respect to any sales person whom the Defendant or Representative determines is not complying with this Order, which may include training, disciplining, and/or terminating such sales person;

*Provided, however*, that this Paragraph VI does not authorize or require the Defendants to take any action that violates any federal, state, or local law.

**VII. RECORD-KEEPING PROVISIONS**

IT IS FURTHER ORDERED that, for a period of five (5) years from the date of entry of this Order, in connection with any business that the Defendants directly or indirectly manage, control, or have a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in these activities, Defendants and their Representatives are hereby restrained and enjoined from failing to create and maintain for a period of three (3) years following the date of their creation, unless otherwise specified:

A. Books, records and accounts that, in reasonable detail, accurately and fairly reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues;

B. Records containing the name, address, telephone number and social security number of each person employed by the Defendants in any capacity, including as an independent contractor, that person's job title or position, the date upon which the person commenced work, and the date and reason for the person's termination, if applicable; *provided, however*, that the businesses subject to this requirement shall retain such records during the employment of any person, and for a period of two (2) years after the date of their termination;

C. Records containing the name, address, telephone number, quantity of goods or services purchased, and a description of the goods or services purchased, for all consumers to whom the business has sold, invoiced or shipped any Franchise, Business Venture or income-generating product or service;

D. Records that reflect, for every written or oral consumer complaint or refund request received by the Defendants or their Representatives, whether directly or indirectly or through any third party: (1) the customer's name, address, telephone number; (2) the dollar amount paid by the consumer; (3) the written complaint or refund request, if any; (4) the basis of the complaint or refund request, including the name of any salesperson complained about; (5) the nature and result of any investigation conducted concerning the complaint or refund request; (6) each response and the date of the response to the complaint or refund request; and (7) any final resolution of the complaint or refund request, and the date of the resolution; and (8) in the event of a denial of a refund request, the reason for the denial; and

E. Copies of all sales scripts, training materials, advertisements, or other marketing materials utilized, which shall be retained for three (3) years after the last date of their dissemination or use.

**VIII. ACCESS TO BUSINESS PREMISES**

IT IS FURTHER ORDERED that for a period of five (5) years from the date of entry of this Order, for the purposes of determining or securing compliance with its provisions, the Defendants and their Representatives shall grant to representatives of Plaintiff and the Commission, within three (3) business days of receipt of written notice from Plaintiff or the Commission:

A. Access during normal business hours to any office or facility storing documents of any business that the Defendants directly or indirectly manage, control, or have a majority ownership interest in, that is engaged in the sale or distribution of any Franchise, Business Venture, or income-generating product or service, or assisting others engaged in such activities. In providing such access, Defendants shall permit representatives of Plaintiff or the Commission to inspect and copy all documents relevant to any matter contained in this Order; and shall permit representatives of Plaintiff or the Commission to remove such documents for a period not to exceed five (5) business days so that the documents may be inspected, inventoried, and copied; and

B. The opportunity to interview, without restraint or interference, officers, directors, employees, contractors, and agents, including all personnel involved in responding to consumer complaints or inquiries and all sales personnel, whether designated as employees, consultants, independent contractors or otherwise, of any business to which Subsection A of this Paragraph applies, regarding compliance with the provisions of this Order. Any person interviewed may have counsel present.

*Provided, however*, that upon application of the Plaintiff or the Commission for good cause shown, the Court may enter an *ex parte* order granting immediate access to Defendants' business premises for the purposes of inspecting and copying all documents relevant to any matter contained in this Order.

## IX. AUTHORITY TO MONITOR COMPLIANCE

IT IS FURTHER ORDERED that the Plaintiff and the Commission are authorized to monitor Defendants' compliance with this Order by all lawful means, including but not limited to the following:

A. Plaintiff and the Commission are authorized, without further leave of Court, to obtain discovery from any person (including the Defendants) in the manner provided by Chapter V of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 26-37, including the use of compulsory process pursuant to Fed. R. Civ. P. 45, for the purpose of monitoring and investigating Defendants' compliance with any provision of this Order.

B. Plaintiff and the Commission are authorized to use representatives posing as consumers or suppliers to Defendants, Defendants' employees, or any other entity managed or controlled in whole or in part by any Defendant, without the necessity of identification or prior notice; and

C. Nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. § 49 and 57b-1, to investigate whether the Defendants have violated any provision herein or Section 5 of the FTC Act, 15 U.S.C. § 45, or any applicable rule or regulation promulgated and enforced by the Commission, including the Franchise Rule, 16 C.F.R. § 436.

## X. FEES AND COSTS

IT IS FURTHER ORDERED that each party to this action shall bear its own costs and attorneys' fees incurred in connection with this action.

**XI. RETENTION OF JURISDICTION**

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for the purpose of enabling the parties to apply to the Court at any time for such further orders and directives as may be necessary or appropriate for the interpretation or modification of this Order, for the enforcement of compliance therewith, or for the punishment of violations thereof.

**XII. CIVIL PENALTY**

IT IS FURTHER ORDERED that judgment in the amount of $__________ is hereby entered against the Defendants as a civil penalty, pursuant to Section 5(m)(1)(A) of the Federal Trade Commission Act, 15 U.S.C. § 45(m)(1)(A).

SO ORDERED this ________ day of _______________, 2000.

______________________________________
WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

cc:
AUSA Barbara Petras
Drake Cutini, Esq.
Peter Gruber, Esq.
Old Dominican Tobacco Corp.
Neil Young